WELCH, Judge.
Ellis Andrei Diggs was convicted of the intentional murder of Garry Blackwell, see § 13A-6-2(a)(l), Ala.Code 1975. Diggs was sentenced as a habitual felon to life in prison without the possibility of parole. On appeal, Diggs contends that the trial court committed reversible error when it refused to instruct the jury on self-defense and provocation manslaughter.
Diggs contends that the evidence .presented during his trial supported the giving of a jury instruction on self-defense.

*158
Facts

On the night of February 3, 2012, Blackwell was using an abandoned house on Haardt Street in Montgomery for the purpose of hosting,[1] for paying customers, an entertainment venue providing female dancers, strippers, and prostitutes. This venue was called “The Cave.” (R. 279.) Chasity Bowen was Diggs’s longtime girlfriend. She worked for Blackwell as a dancer and stripper.. According to Bowen, Blackwell had not been acting like himself. She claimed that he had recently gotten into an altercation with another dancer who worked for him, and on the morning of February 4 he had consumed more alcohol than was normal for him and he was intoxicated or at least, according to Bowen, over his limit. At approximately 4:00 a.m. on the morning of February 4, 2014, Bowen and Blackwell got into a dispute that escalated into foul language, spitting on one another, Blackwell’s delivering a glancing blow across Bowen’s cheek, and ultimately Blackwell’s lifting Bowen by her waist and carrying her from inside The Cave into the yard. Bowen testified that, after being removed from The Cave, she told Blackwell that “you done fucked up.... I got a boyfriend that’s going to fuck you up.” (R. 285.) According to Bowen, Blackwell responded, “I don’t give a fuck about your boyfriend. I done played football.... You think I’m worried about a simple basic nigger?” (R. 285.) Bowen testified that Blackwell further stated, “I don’t give a fuck who you call and what they bring, because when they made one gun, they made more.... [I]f they come up here and think they are going to control and do this and do that, I will bury them.” (R. 298.) Bowen testified that she got a ride home where she woke Diggs from his sleep and told him what Blackwell had done. Bowen testified that she wanted Diggs to confront Blackwell about the way he was “acting out,” but she did not want Blackwell to be killed. Bowen testified that Diggs stated, “Blackwell fucked up” and he and his brother, Eric Johnson, left. (R. 287.) When Diggs returned, he told Bowen what had happened at The Cave concerning his shooting Blackwell.
Diggs testified on his own behalf as follows. Chasity Bowen had been Diggs’s girlfriend for five or six years and Diggs considered her to be his wife. He also knew and accepted that Bowen worked for Blackwell as a dancer and stripper. Diggs knew Blackwell because Bowen worked for Blackwell and because about eight months earlier, Blackwell and Blackwell’s two young daughters had lived with Bowen during a period when Diggs was in jail. Diggs stated that he was not happy about that situation, but, according to Diggs, any differences he and Blackwell may have had about Blackwell’s living with Bowen had been resolved through discussion and based on their mutual respect for one another. Ultimately, following Diggs’s release from jail, Blackwell voluntarily moved out of Bowen’s residence. Diggs testified that he had not had any problem with Blackwell from the time Blackwell moved out of Bowen’s house until the night Blackwell died.
Diggs testified that Bowen was known to tell a lie and to exaggerate. When she woke him up in the early morning of February 4, 2012, she was hysterical and saying that Blackwell had' “put his hand on [her].” (R. 380.) She did have some swelling on her face. Diggs asserted that he did not go to The Cave intending to shoot Blackwell. He claimed that he intended to go to The Cave and speak to *159 Blackwell and find out if what Bowen said was true. According to Diggs, if it was true he intended to tell Blackwell “to stay away from [Bowen], don’t call her no more, it is over with, y’all ain’t going to have no more dealings” and that if Blackwell ever put his hands on Bowen again it was going to create a serious problem between them. (R. 403.)
“I mean, Chasity, I have been with her six years. She is like my wife. No, I don’t think I am wrong for going up there. I wanted to see why [Blackwell] put your hands on her, what happened. What made [Blackwell] do this? I am going to see.
“Would you go up there and see if it was your wife?”
(R. 396.)
Bowen told Diggs that Blackwell had a .380 caliber pistol and that he had commented that “he was going to bury [her boyfriend].” (R. 381.) Diggs said that he took his 9 mm. pistol with him to The Cave for his personal protection because he lived in a dangerous area, because of what goes on at The Cave, and because Bowen told him that Blackwell had a gun. Diggs said that his brother, Eric Devon Johnson,[2] went with him. The Cave was approximately five to seven blocks from Diggs’s house. Diggs testified that he weighed 165 to 170 pounds and Blackwell was “way bigger.” (R. 383.) The autopsy report disclosed that the 46-year-old Blackwell was 6 feet 2 inches tall and weighed 288 pounds. (R. 176.) When Diggs walked up to the front of The Cave, Blackwell and another big man were standing outside near the front door. Diggs stated that when he said that he was looking for Blackwell, Blackwell stepped inside the house for about a minute. (R. 384.) Blackwell returned and stood a few steps outside the front door. Diggs was never asked to leave. For “a couple of minutes” Diggs and Blackwell were having a calm conversation during which Diggs asked Blackwell if Blackwell had put his hands on Bowen. (R. 385.) At first Blackwell said he had not but that he had escorted her out of The Cave. According to Diggs, about the time Blackwell recounted that Bowen had spit on him, that “he just flipped,” and that everything escalated. (R. 385.) According to Diggs,
“[Diggs] said, did you[, Blackwell,] put your hands on [Bowen]? Then [Blackwell] kept, he was explaining himself. But then [Blackwell] flipped. [Blackwell] was like, ‘[Bowen] spit at me, and I spit back on that bitch.’ When [Blackwell] said that, I said, ‘damn.’ So when I said ‘damn,’ he was like, ‘yeah, I did it.’ And he said, T ain’t got to explain it. I am sick of this shit.’ When he said that, he upped.[3] When he upped, he shot.”
(R. 386.) Diggs testified that he and Blackwell were at “close range” from one another when Blackwell fired his pistol at Diggs. (R. 399.) Diggs thought that he was about to die. He did not “see how [Blackwell] didn’t shoot [him].” (R. 399.) Diggs did not remember pulling his gun, but he must have pulled his pistol from his waist and just “started shooting rapid” as he ran away. (R. 387.) He did not aim, he “just shot and [he] ran.” (R. 398.) Diggs had no idea how many times he fired his pistol, but he fired all his bullets in “[pjrobably two seconds.” (R. 387.) He ran all the way home. Diggs did not know *160 if Johnson had a gun or if anyone other than he and Blackwell had fired a gun. Johnson must have run when the gunfire began because he beat Diggs back to his house. Diggs knew that he shot Blackwell, but initially, he did not know Blackwell had died. Diggs further testified that he had convictions for nonviolent felonies[4] and that, as a convicted felon, he was not allowed to carry a gun and that, for that reason, he did not have a permit to carry a gun.
Investigators and experts gave the following testimony. Blackwell was shot five times and died of multiple gunshot wounds.[5] No firearms were recovered. No bullets were recovered from Blackwell’s body. A total of 16 bullet cartridge cases were recovered outside The Cave. Those cartridge cases had been discharged from “at least two and possibly three firearms.” (R. 385.) There were six 9 mm. cases fired from one Makarov brand cartridge firearm. There were nine 9 mm. cartridge cases fired from a Luger brand firearm. A .380 automatic-caliber cartridge case was recovered near the front door of The Cave. Although it is not typical, a .380 caliber bullet can be fired from a 9 mm. Makarov firearm and 9 mm. Luger firearm. In this case, the expert determined that the .380 had not been fired from a Luger. However, the expert testified that whether it had been fired from the Makarov was inconclusive. Thus, the expert concluded that the cartridge casings could have been fired from three firearms. A photograph showing the location and type of each shell cartridge was shown to the jury. Of all the cartridge cases, the .380 cartridge case was the closest to the front door of The Cave.
In addition to the testimony set forth above, there was testimony presented at the trial reflecting that Diggs did not react in self-defense as he described but that instead, he had acted as the initial aggressor in the altercation with Blackwell. Also, much of the witnesses’ testimony conflicted in varying degrees with their own previous statements and with testimony from other witnesses.

Analysis

“Judge Bowen, writing for this Court in King v. State, 478 So.2d 318 (Ala.Crim.App.1985), set forth the oft-repeated rules regarding a trial court’s obligation to charge a jury on self-defense when the evidence presents the claim:
“ ‘The general rule is that “every accused is entitled to have charges given, which would not be misleading, which correctly state the law of his ease, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility.” Chavers v. State, 361 So.2d 1106, 1107 (Ala.1978). If there is “any evidence, however slight, tending to support” that the defendant acted in self-defense, the issue should be submitted to the jury. King v. State, 71 Ala. 1, 4 (1881). In most cases, the issue of self-defense is one of ultimate fact solely for determination by the jury, Domingus v. State, 94 Ala. 9, 11 So. 190 (1892), however “unsatisfactory and inconclusive to the judicial mind” the evidence of self-defense may appear. Burns v. *161 State, 229 Ala. 68, 70, 155 So. 561, 562 (1934).
“ ‘However, the court should not instruct on the law of self-defense where there is no evidence to sustain the plea. Raines v. State, 455 So.2d 967, 974 (Ala.Cr.App.1984); Tarver v. State, 137 Ala. 29, 34 So. 627 (1903); C. Gamble, McElroy’s Alabama Evidence, 457.02(5) (3d ed.1977). “[I]n the absence of all evidence having a tendency to show that at the time of the killing the accused was in imminent peril of life, or grievous bodily harm, or of the existence of circumstances creating in his mind a reasonable belief of such peril, ... these instructions [are] abstract.” King, 71 Ala. at 4-5. A trial judge may properly refuse to charge the jury on self-defense where he determines that “the defendant could not set up self-defense under the facts.” Consford v. State, 15 Ala.App. 627, 634, 74 So. 740, 743, cert. denied, 200 Ala. 23, 75 So. 335 (1917).
“ ‘In determining whether to charge the jury on self-defense, “evidence most favorable to the defendant should be considered and if there is the slightest evidence tending to prove a hostile demonstration which can be reasonably interpreted as placing the accused, at the time of the killing, in apparent imminent danger to life or other grievous bodily harm then the matter of self-defense becomes a question for the jury.” Byrd v. State, 257 Ala. 100, 104, 57 So.2d 388, 391 (1952).’
“King v. State, 478 So.2d at 319 (emphasis added). See also Carter v. State, 843 So.2d 812, 813 (Ala.2002).”
Mordecai v. State, 858 So.2d 993, 997 (Ala.Crim.App.2003)(noting that there was at least “slight evidence” that Mordecai was in “imminent danger to life or other grievous bodily harm,” which rendered trial court’s refusal to give self-defense instruction reversible error).
“ ‘Once the issue of self-defense is raised, the State must prove that the accused did not act in self-defense in the sense that the State must prove a prima facie case of unjustified homicide.’ Ex parte Johnson, 433 So.2d 479, 481 (Ala.1983). See also Howard v. State, 420 So.2d 828 (Ala.Crim.App.1982). Thus, the State continues to have the burden of proving all of the elements of homicide and ‘must counter any evidence presented by the defendant which would raise a reasonable doubt as to the existence of one of those elements.’ Johnson at 481. The weight and credibility of the evidence is for the jury’s determination. Id.”
Smith v. State, 602 So.2d 470, 471 (Ala.Crim.App.1992).
The State contends on appeal, as it did at trial, that, because Diggs armed himself and sought to confront Blackwell, Diggs assumed the status of the initial aggressor and therefore cannot utilize the defense of self-defense. See § 13A-3-23(c)(2), Ala.Code 1975, (providing that a person is not justified in .using physical force in his or her defense if he or she is the initial aggressor). Moreover, the State argues that because Diggs was a convicted felon, his arming himself with a pistol constituted unlawful activity; thus, according to the State, because Diggs was engaged in unlawful activity when he went to The Cave, his presence at The Cave was unlawful and thus negates the defense of self-defense. See § 13A-3-23(b) (“A person who is justified ... in using physical force, including deadly physical force, and who is not engaged in an unlawful activity and is in any place where he or she has the right *162 to be has no duty to retreat and has the right to stand his or her ground.”).
The State is incorrect on both counts. Diggs’s testimony, if believed by the jury, established Blackwell as the initial aggressor. See § 13A-3-23(a)(l), Ala.Code 1975, (“A person may use deadly physical force [upon another person] ... if the person [ (who is now claiming self-defense) ] reasonably believes that another person is ... [u]sing or about to use unlawful deadly physical force.”). In Diggs’s rendition of the facts, Blackwell became agitated during discussions regarding Blackwell’s treatment of Bowen, and, as a result, it was Blackwell who ended their discussion by suddenly, and without provocation from Diggs, pulled out his pistol and shot at Diggs. In Gaines v. State, 137 So.3d 357 (Ala.Crim.App.2013)(diseussing improper jury instruction), this Court noted that there is a difference between merely starting a controversy and being an initial aggressor in an altercation involving physical force. “ ‘Controversy,’ ... is defined as ‘a discussion marked esp. by the expression of opposing views: dispute.’ Merriam-Webster’s Collegiate Dictionary 272 (11th ed.2003).” Gaines v. State, 137 So.3d at 361 (emphasis omitted.) Diggs’s testimony discloses that he engaged in a controversy with Blackwell over Blackwell’s treatment of Bowen. Diggs’s testimony portrayed Blackwell as the aggressor who elevated their controversy into an altercation involving deadly physical force. “ ‘Aggressor’ is defined as ‘one that commits or practices aggression,’ Merriam-Webster’s Collegiate Dictionary 25 (11th ed.2003), and ‘aggression’ is defined as ‘a forceful action or procedure (as an unprovoked attack) esp. when intended to dominate or master.’ Id. at 24.” Gaines v. State, 137 So.3d at 361.
Moreover, contrary to the State’s assertion, a felon is not deprived of the right to use a firearm against the immediate need to defend his life.
“ ‘[W]hen a felon is in imminent peril of great bodily harm, or reasonably believes himself or others to be in such danger, he may take possession of a weapon for a period no longer than is necessary or apparently necessary to use it in self-defense, or in defense of others. In such a situation justification is a defense to the charge of felon in possession of á firearm.’ ”
Ex parte Taylor, 636 So.2d 1246, 1247 (Ala.1993)(quoting State v. Blache, 480 So.2d 304 (La.1985)). Diggs’s possession of a firearm before his need to defend his life may have been an event in violation of the law. However, his possession of a firearm was justified at the moment it became necessary for his self-defense.
Because Diggs presented evidence in support of his self-defense claim, the trial court erred when it refused to give the requested instruction to the jury.
“As our Supreme Court aptly stated decades ago, ‘However unsatisfactory and inconclusive to the judicial mind, yet there was some proof affording tendencies in support of this plea. The infer-enees to be drawn therefrom were for the jury, and not the court. We feel impelled therefore to pronounce this action of the court as error to reverse.’ ”
Mordecai v. State, 858 So.2d at 998 (quoting Burns v. State, 229 Ala. 68, 70, 155 So. 561, 562 (1934)). As in Mordecai, “the trial court eviscerated” Diggs of his “entire defense when it refused' to instruct the jury on self-defense.” Mordecai v. State, 858 So.2d at 998. Diggs was denied a fair trial, and his conviction must, therefore, be reversed and the cause remanded.
Because the trial court’s failure to charge the jury on self-defense requires a reversal of Diggs’s conviction, we need not *163 address Diggs’s challenge to the trial court’s refusal to charge the jury on provocation manslaughter. However, we do note that self-defense and provocation manslaughter are not mutually exclusive and that the failure to give the charge appears to be error. See James v. State, 24 So.3d 1157, 1164 (Ala.Crim.App.2009)(“Self-defense and provocation manslaughter are not mutually exclusive, and whether there was sufficient provocation recognized by law was a question for the jury.”).
REVERSED AND REMANDED.
WINDOM, P.J., and KELLUM, J., concur.
BURKE, J., concurs in the result.
JOINER, J., concurs in part and dissents in part, with opinion.

. Blackwell was described as a businessman who had provided this type entertainment for a number of years at various locations in the Montgomery area.

. Johnson and Diggs were tried together. Johnson was convicted of intentional murder. In an opinion also being released today, his conviction is being reversed and the case remanded. See Johnson v. State, 168 So.3d 163 (Ala.Crim.App.2014).

3. Diggs explained that "upped” means to raise a pistol.

. Those convictions were for obstruction of justice, giving a false identification, possession of marijuana, third-degree burglary, and receiving stolen property.

. The doctor who performed the autopsy stated that Blackwell died of multiple gunshot wounds, but he also stated that the wound that actually caused Blackwell’s death entered his shoulder, and traveled through both of his lungs.