BURKE, Judge.
Paudriciquez Martez Fuller appeals his conviction for murder made capital because the. murder was committed by or through the use of a deadly weapon fired or otherwise used within or from a vehicle. See § 13A-5-40(a)(18), Ala.Code 1975.' Fuller was sentenced to .life imprisonment without the possibility of parole. •

Facts

During ■ -the ■ evening of-June 6, 2013, Fuller shot and killed Romaine Wither-spoon. Curtis Robinson testified that, shortly before the shooting, he and several other people, including Witherspoon, were watching a basketball game on television inside a house on Hillside Avenue. Robinson left the house to go pick up his child,but he returned to the house shortly thereafter. Robinson testified that, upon his return, while he was still, outside the house, he saw Fuller and his girlfriend slowly drive by the'house two times and then turn around to drive by the house a third time. Robinson went inside the house and informed everyone that Fuller was driving by the house. Robinson, Witherspoon, and a few other people walked outside. According to Robinson, he handed Witherspoon a handgun, and Witherspoon put the gun in his back pocket. Witherspoon walked out to the road, threw up his hands, and asked Fuller: “What’s going on?" Robinson testified that he did not see a gun in Witherspoon’s hands when he confronted Fuller. Robinson then witnessed two gunshots come from the driver’s side of the vehicle that Fuller was driving. According to Robinson, immediately after those.two gunshots, *1209 Witherspoon fell to the ground and then fired a couple of shots at Fuller as he was driving away. Robinson retrieved the gun that he had given to Witherspoon, arid then Robinson left the scene.
Andrew Antwah Morris testified that, on June 6, 2013, he was watching the basketball game with Witherspoon, Robinson, and other people in the house on Hillside Avenue. Morris further testified that he saw Fuller drive by the house four or five times within an hour. Morris, Wither-spoon, Robinson, and a' couple of other people exited the house as Fuller was driving by the last time. Morris heard someone’ inside the vehicle say something. Morris testified that Witherspoon approached the vehicle with his hands up and stated: ‘What’s up?” Morris then heard a girl inside the vehicle state: “Don’t shoot that gun in my car, [Fuller], my baby in here.” (R. 220.) Morris knew that Robinson had given Witherspoon a gun, but Morris did not see the gún in Wither-spoon’s hands when he approached Fuller’s vehicle. According to Morris, as Witherspoon approached the vehicle, Fuller fired two shots at Witherspoon, The shots struck Witherspoon and spun him around. As Witherspoon was falling to the ground, he pulled a gun out of his pocket and fired multiple shots at Fuller as he was driving away.
Belton Andre Perkins testified that, on June 6, 2013, he was watching, the basketball game with Witherspoon, Robinson, Morris, Wayne Cook, and other people in the house on Hillside Avenue. Perkins further testified that Robinson had left the house to go pick up one of his children. When Robinson returned to the house, he said something .to Witherspoon and they went outside. Perkins and Morris followed them outside. Perkins then saw Fuller slowly driving by the house. Perkins had not seen Fuller drive by the house earlier that day. Perkins testified that, before Fuller reached the front of the house, Cook said: “Shoot, - [Witherspoon]. Shoot, [Witherspoon].” (R. 262.) According to Perkins, as Fuller was slowly driving by the house, he said something. At that point, Witherspoon sat down a cup that was in his hand, walked toward Fuller’s vehicle with his hands up, and stated: “What you said fucking’ nigga? What you said?” (R. 249.) Perkins testified that he did not see a gun in Witherspoon’s hands at that time. Then, according to Perkins, Fuller fired two shots at Witherspoon. Witherspoon fell to the ground and then fired multiple shots at Fuller as he was quickly driving away. Perkins testified that he saw Robinson give a gun. to With-erspoon before the confrontation with Fuller and that Witherspoon put that gun in his back pocket.
Brian Rashad Pettigrew testified that, on June 6, 2013, he was watching the basketball game with Witherspoon, Robinson, and other people in the house on Hillside Avenue. Pettigrew saw the vehicle that Fuller was driving pass by the house two or three times that day. While Pettigrew was watching the basketball game, Robinson entered the house and stated that everyone needed to come outside. Pettigrew and several other people went outside. At that time, Pettigrew saw Fuller’s vehicle drive toward the house and then stop in the middle of the road in front of the house. According to Pettigrew, Witherspoon walked toward the vehicle with his hands up and said: “What’s, up?” (R, 271.) Pettigrew did not see a gun in Witherspoon’s .hands. As Witherspoon approached the vehicle, Pettigrew heard some arguing and then he heard two gunshots come from the driver’s side of the vehicle. Immediately after those shots, Witherspoon fell down, and then Pettigrew heard four or five more gunshots as the vehicle drove away. Pettigrew did not know who fired those four or five gunshots *1210 because, he said, he was focused on the vehicle. Pettigrew further testified that on the day before the shooting, June 5, 2013, he -witnessed another altercation between Witherspoon and Fuller. In that altercation, Fuller and Witherspoon again exchanged words as Fuller was driving by them. As Fuller was driving away from them, Witherspoon picked up rock. After Fuller had driven about 50 yards away, he stuck his head out the window and said: “I’m gonna kill you, boy.” (R. 275.)
Dr. Gary Simmons performed the autopsy on Witherspoon’s body. Dr. Simmons testified that Witherspoon died from a gunshot wound that went through the lower portion of his torso. Specifically, the gunshot wound went through Wither-spoon’s right external iliac artery and vein, which caused a large amount of internal bleeding. Dr. Simmons also testified that Witherspoon’s blood-alcohol level was checked twice. A sample of Witherspoon’s blood that was taken at the hospital had an alcohol level of .12 grams per deciliter, and a sample of Witherspoon’s blood that was taken during the autopsy had an alcohol level of .11 grams per deciliter.
Quantrevia Michelle Smoot, Fuller’s girlfriend, testified for the defense. Smoot testified that on June 5, 2013, as she and Fuller were driving down the road, they saw Witherspoon and some of his friends standing beside the road. According to Smoot, Witherspoon said something to Fuller and then picked up a brick and threw it at the vehicle. Smoot testified that she and Fuller simply drove away. Smoot testified that on June 6, 2013, she and Fuller were driving down Hillside Avenue because her aunt lives on that road. Smoot testified that they could not drive fast down that road because it is narrow and vehicles were parked on the side of the road. While driving their vehicle down Hillside Avenue, Smoot and Fuller saw Witherspoon and some of his friends. According to Smoot, Witherspoon walked toward the vehicle and yelled something at Fuller. Fuller stopped the vehicle and began arguing with Witherspoon. Smoot then saw Robinson give Witherspoon a handgun. Smoot testified that Wither-spoon approached the vehicle pointing the gun at the vehicle. Smoot further testified that she grabbed her baby, who was in the backseat of the vehicle, and laid down. Immediately after Smoot grabbed her baby, she heard gunshots, but she did not see who fired the shots. Then, Smoot and Fuller drove away.
Fuller testified in his own defense at trial. Fuller testified that on June 5, 2013, he was driving down the road when he saw Witherspoon and a couple of his friends. Witherspoon said something to Fuller, and Fuller stopped the vehicle. After he stopped, Fuller saw Witherspoon pick up a brick and throw it at Fuller’s vehicle. Fuller testified that he simply drove away. On June 6, 2013, Fuller and Smoot were driving to Smoot’s aunt’s house via Hillside Avenue. According to Fuller, he decided to take that route because he wanted to avoid the nearby area where the incident with Witherspoon had taken place the day before. Fuller was driving down Hillside Avenue slowly because the road is narrow. As Fuller was driving down Hillside Avenue, Witherspoon yelled something at Fuller. Fuller and Witherspoon exchanged words, and Fuller stopped the vehicle. Fuller testified that he saw Robinson give Witherspoon a gun and that he heard someone say: “Shoot. Shoot him.” (R. 455.) Fuller further testified that Witherspoon pointed the gun at the vehicle. Fuller then grabbed his gun and fired two shots at Witherspoon. According to Fuller, the whole situation happened very fast, and Witherspoon started firing shots about the same time as Fuller started firing shots. After Fuller fired two shots, he drove away. Fuller testified that he believed that his life and the lives of “[his] *1211 family” were in danger when Witherspoon pointed the gun at him and when he heard someone say “shoot him,” (R. 457-58.)

Discussion

I.
On appeal, Fuller- first argues that the trial court committed reversible error when it ruled that Alabama’s “stand-ycmr-grourid” law did not apply and when it instructed the jury that Fuller had a duty to retreat.
Section 13A-3-23, Ala.Code 1975, provides, in pertinent part:
' “(a) A person is justified in using physical force upon another person in order to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he or she may use a degree of force which he or she reasonably believes to be necessary for the purpose. A person may use deadly physical force, and is legally presumed to be justified in using deadly physical force in self-defense or the defense of another person pursuant to subdivision (4), if the person reasonably believes that another person is:
“(1) Using or about to use unlawful deadly physical force.
[[Image here]]
“(3) Committing or about to commit a kidnapping in any degree, assault in the first or second degree, burglary in any degree, robbery in any degree, forcible rape, or forcible sodomy.

U

“(b) A person who is justified under subsection (a) in using physical force, including deadly physical force,'and who is not engaged in an unlawful activity and is in any place where he or she has the right to be has no duty to retreat and has the right to stand his or her ground..
“(c) Notwithstanding the provisions of ■■'subsection (a), a person is not justified in using physical force if:
“(1) With intent to cause 'physical injury or death to another person, he or she provoked the úse of unlawful physical force by such other person.
• “(2) He or she was the initial aggressor, except that his or her use of physical force upon another person under the circumstances is justifiable if-he or she withdraws from the encounter and effectively communicates to the other person his or her intent to do so, but the latter person nevertheless continues or threatens the use of unlawful physical force.
“(3) The physical force involved was the product of a combat by agreement not specifically authorized by law.
“(d) A person who uses force, including deadly physical forcé, as justified and permitted in this section is immune from criminal prosecution and civil action for the use of such force, unless the force was determined to be unlawful.” In this case, the trial court held:
“The Court finds that the defendant is a felon. And the evidence in this ease establishes that he was in possession of a pistol or had a pistol under his control at the time of the shooting. Therefore, he was engaged in an unlawful activity. So, the stand your ground law — stand your ground defense does not apply. And the defendant had a duty to retreat. The jury will be charged accordingly.”
(R. 447.)[1]
The trial court further stated:
*1212 “The Court finds that a felon in possession of a'firearm is the Class C Felony in Alabama. So, he was engaged in an unlawful activity by being in possession of.a firearm, therefore, had no right to stand his ground. That [proposed jury instruction] will be refused.”
(R. 519.)
The trial court instructed the jury:
“One of issues in this case is' self-defense. -A person may use physical force upon another person, in orde.r to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person. And he may use a degree of force which he reasonably believes to be necessary for the purpose. ■
“A person' may use deadly physical force in order to defend himself if he reasonably believes that the other person is either using or .about to use unlawful deadly physical force or committing or about To commit an assault in the first or second degree. For the defendant’s use of deadly physical force against another person to justified, the deadly physical force must have been used under the following circumstances: The defendant must have reasonably believed that Romaine Witherspoon was using or about to use unlawful deadly physical force upon him or a third person. Or the defendant must havé reasonably believed that Romaine Witherspoon was committing or about' to commit an assault in the first or second degree.

U

“Retreat. The' defendant is not justified in using deadly physical force upon another person and cannot prevail on the issue of self-defense. -.If it reasonably appears where the defendant knows that he can avoid the necessity of using such force with complete safety by. retreating. [sic.] The defendant does not have the burden of proving that he acted in self-defense. To the contrary, once self-defense becomes an issue, the State has ,the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense.”
(R. 624-26.)
This Court has stated:
“ ‘The general rule is that “every accused is entitled to have, charges given, which would not be misleading, which correctly state the law of his case,, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility.” Chavers v. State, 361 So.2d 1106, 1107 (Ala.1978).”
Mordecai v. State, 858 So.2d 993, 997 (Ala.Crim.App.2003), quoting King v. State, 478 So.2d 318, 319 (Ala.Crim.App.1985) (emphasis omitted).
After Fuller was convicted, 'this Court released Diggs v. State, 168 So.3d 156 (Ala.Crim.App.2014), In Diggs, Garry Blackwell used an abandoned house for the purpose of hosting an entertainment venue that provided female dancers, strippers, and prostitutes. This venue was called “The Cave.” Ellis Andrei Diggs’s longtime girlfriend, Chasity Bowen, worked for Blackwell as a stripper. Diggs testified that Bowen woke him up early one morning and told him that Blackwell had “put his hand on her.” Diggs armed himself with a pistol and went to The Cave to speak to Blackwell and find out whether what Bowen had said was true. According to Diggs, after a short conversation, Blackwell .became angry, raised a pistol at *1213 Diggs, and fired a shot. Diggs testified that he returned fire with his pistol as he ran away. Blackwell was shot five times and died of multiple gunshot wounds. Diggs testified that he had prior felony convictions and that, as a convicted felon, he was not allowed to carry,a gun. Diggs was convicted of the murder of Blackwell. Diggs, 168 So.3d at 158-60.
In Diggs, the trial court refused to give any instruction to the jury concerning Diggs’s right to defend himself under § 13A-3-23(a), Ala.Code 1975. On appeal, Diggs contended that the trial court had committed reversible error when it refused to instruct the jury on self-defense, and provocation manslaughter. The State responded that
“because Diggs armed himself and sought to confront Blackwell, Diggs assumed the status of the initial aggressor and therefore cannot utilize the defense of self-defense. See § 13A-3-23(c)(2), Ala.Code 1975 (providing that a person is not justified in using physical force in his or her defense if he or she is the initial aggressor). Moreover, the State argues that because Diggs was a convicted felon, his arming himself with a pistol constituted unlawful activity; thus, according to the State, because Diggs was engaged in unlawful -activity when he went to The Cave, his presence at The Cave was unlawful and thus negates the defense of self-defense. See § 13A-3-23(b) (‘A person who is justified ... in using physical force, including deadly physical force, and who is not engaged in an unlawful activity and is in any place where he or she has the right to be has no duty to retreat and has the right to stand his or her ground.’).”
Diggs, 168 So.3d at 161-62.
A majority of this Court stated that “[t]he State is incorrect on both counts.” Diggs, 168 So.3d at 162. Accordingly, this Court stated that “Diggs’s testimony, if believed by the jury, established Blackwell as the initial aggressor.” Diggs, 168 So.3d at 162. Further, a majority of. this Court stated:
“[Cjontrary to the State’s assertion, a felon is not deprived of the right to use a firearm against the immediate need to defend his life.
“ ‘ “[W]hen a felon is in imminent peril of great bodily harm, or reasonably believes himself or others to be in such danger, he may-take possession of a weapon for a period no longer than is necessary or apparently necessary to use it in self-defense, or in defense of others. In such a situation justification is a defense tó the charge of felon in possession of a firearm.” ’
“Ex parte Taylor, 636 So.2d 1246, 1247 (Ala.1993) (quoting State v. Blache, 480 So.2d 304 (La.1985)). Diggs’s possession of a firearm before his need to defend his life may have, been an event in violation of the law, However, his possession of a firearm was justified at the moment it became necessary for his self-defense.”
Diggs, 168 So.3d at 162.
t Finally, this Court held that, “[bjecause Diggs presented evidence in support of his self-defense claim,..-the trial court erred when it refused to give the. requested instruction to the jury.” Diggs, 168 So.3d at 162. Accordingly,, we reversed Diggs’s-conviction and remanded the case for a new trial.
In the present case, Fuller urges this Court to follow Diggs. Fuller argues that his possession of a firearm .before the altercation that led to Witherspoon’s death might have been an event in violation of the law; however, he asserts, based on the testimony of Fuller and Smoot, his possession of a firearm was justified, -and thus was not an “unlawful activity,” at the mo- *1214 raent it became necessary for his self-defense. Therefore, Fuller argues that, in addition to the instruction on self-defense under 13A-3-23(a), Ala.Code 1975, he was entitled to an instruction under § 13A-3-23(b), Ala.Code 1975, informing the jury that, if he was justified under subsection (p) in using physical force, he had no duty to retreat.
There is language in Diggs that seems to-support Fuller’s argument. However, the language in Diggs concerning the defendant’s duty to retreat was unnecessary and, thus, was merely dicta. Unlike the present situation, in Diggs the trial court erroneously refused to give any instruction to the jury concerning the defendant’s right to defend himself under § 13A-3-23(a), Ala.Code 1975. That error alone warranted reversal of the trial court’s judgment. It was unnecessary for this Court to analyze the separate issue concerning the limited right of a person to “stand his or her ground” if that person is' “justified under subsection (a) in using physical force,” see ’§ 13A-3-23(b), Ala. Code 1975.
In the present case, the issue whether Fuller, the defendant, was entitled to a “no-duty-to-retreat” instruction is squarely before us. Specifically, the issue whether Fuller was “engaged in an unlawful activity” under § 13A-3-23(b), Ala.Code 1975, is squarely before us. Fuller urges this Court to follow the dicta set forth in Diggs. However, in the present case, we hold that the trial court did not commit reversible eiTor when it ruled that Alabama’s “stand-your-ground” law did not apply because -Fuller was engaged in unlawful activity.
Section 13A-3-23(b) provides a qualified exception' to the common-law rule that required a person to retreat rather than use deadly physical force if that person can retreat without increasing his or her peril. See Kyser v. State, 513 So.2d 68 (Ala.Crim.App.1987) (setting forth the standard concerning a person’s duty to retreat under the common law and under a prior version of § 13A-3-23). Section 13A-3-23(b) exempts people who are not engaged in an unlawful activity and are in any place where they have the right to be from the common-law rule.
To support its holding, Diggs relied on Ex parte Taylor, 636 So.2d 1246 (Ala. 1993). Unlike the present situation or the situation in Diggs, in Taylor the issue was “whether § 13A-11-72, Code of Ala.1975, which prohibits a convicted felon from possessing a pistol, is a strict liability statute or whether a convicted felon who is charged with possessing a firearm may raise the defense of self-defense.” Ex parte Taylor, 636 So.2d at 1246. That case did not consider whether a 'defendant had no duty to retreat under § 13A-3-23(b).
In Taylor,
“the city garbage workers of Gadsden were on strike. During that time, because of threats of violence against him and his family, Taylor carried with him in his truck a pistol belonging to his brother. The gun was in the truck on the night- of; October 5, 1989, when he and his -brother were accosted by a group of strikers while they were at a service area of a shopping mall where Taylor maintained the grounds. The strikers drove up ‘cussing and screaming’ and swinging baseball bats and clubs; one of the strikers' had a gun. The strikers accused Taylor and his brother of picking up garbage in defiance of the strike. The Taylors denied that they were picking up garbage and asked the strikers to let them go. The strikers refused. Taylor pulled the gun and gave it to a man who worked at the theaters in the mall, asking him to hold it on the strikers until the he could telephone the police. Taylor went into *1215 the mall and telephoned the police, who came and took him home and remained with him for some time. Thereafter, the mayor had Taylor taken out of town for his safety.”
686 So.2d at 1246.
Based on that factual scenario, the trial court refused to allow Taylor to raise the defense of self-defense. On appeal, after quoting State v. Blache, 480 So.2d 304 (La.1985), and Mungin v. State, 468 So.2d 293 (Fla.Dist.Ct.App.1984), and without providing any other analysis, the Alabama Supreme Court held that the offense set forth in § 13A-11-72 is not a strict-liability offense and that self-defense is a valid defense to the charge of possessing a firearm. Accordingly, the supreme court set aside Taylor’s conviction and ordered a new trial.
Taylor quoted Blache and Mungin, as follows:
“Taylor cites us to cases from the courts of Florida and Louisiana, holding that this offense is not a strict liability offense; we are persuaded by the reasoning of those courts. The Supreme Court of Louisiana has held that self-defense is a valid defense to the charge of possessing a firearm: ‘
“ ‘Wb hold that when a felon is in imminent peril of great bodily harm, or reasonably believes himself or others to be in such danger, he may take possession of a weapon for a period no longer than is necessary or apparently necessary to use it in self-defense, or in defense of others. In such a situation justification is a defense to the charge of felon in possession of a firearm.’
“State v. Blache, 480 So.2d 304 (La. 1985). In Mungin v. State, 458 So.2d 293 (Fla.Dist.Ct.App.1984), the Florida District Court of Appeals reversed a lower court’s judgment concerning the presentation of evidence (in this case the weapon was a knife) as to self-defense, stating:
“ ‘The determination of whether the accused committed the offense charged, acting in his own defense, is a matter for consideration by the jury, not the'trial judge. -[Citations omitted.] • The -jury was entitled to consid-' er the testimony concerning the recent events which led to Mtmgin’s temporary possession of the knife. Such testimony clearly tended to demonstrate that Mungin acted in self-defense.’
“Id. at 295.”
Ex parte Taylor, 636 So.2d at 1247.
Unlike the present situation or the situation in Diggs, Blache and Mungin involved situations in which the defendants did not take possession of the weapons until the moment it became necessary to defend themselves. In Blache, the defendant was sitting on the porch of his father’s house with a friend when a group of male youths approached them. A fight ensued, and one of the youths struck the defendant with a blunt instrument, causing severe head trauma. The defendant staggered into the house and retrieved his brother-in-law’s loaded shotgun from a hall closet. The defendant then used that shotgun to defend himself. Blache, 480 So.2d at 306. The Louisiana Supreme Court specifically noted that there was no evidence indicating that the defendant possessed the shotgun before the encounter with the youths. Blache, 480 So.2d at 305 n. 3.
In Mungin, the defendant was convicted of being a prison inmate in possession of a weapon. The Florida District Court of Appeal held that the trial .court had erred in excluding proffered defense testimony relating to the defense of self-defense in light of evidence indicating that the defendant came into temporary possession of the weapon only after its removal from his *1216 aggressor. Specifically, the proffered testimony indicated that another inmate approached the defendant, pulled out a knife, and then used that knife to attack the defendant. During the ensuing scuffle, and while other inmates were throwing chairs at .the defendant, the knife was dropped and the defendant retrieved it. At that point, a. correctional officer came in and subdued the aggressor. The defendant at first refused to surrender the knife until the other hostile inmates were removed. Mungin, 458 So.2d at 294-95.
Furthermore, in Taylor, the defendant actually did not even use the gun himself. He handed the gun to a coworker who could legally use it and then went to telephone police. Those facts are markedly different than the facts in either the pres-' ent case or Diggs, in which the defendants armed themselves, went to the locations of the victims, and then used the weapons to kill the victims. We do not believe it was the intent of the supreme court for Taylor to be stretched to cover such aggressive criminal 'behavior.- ■
"To support its holding, Diggs quoted Taylor, quoting in turn Blache, as follows:
“ ‘ “[W]hen a felon is in imminent peril' of great bodily harm, or reasonably believes himself or others to be in such danger, he may take possession of a weapon for a period no longer than is necessary or apparently necessary to use it in self-defense, or in defense of others.' In such a situation justification is a defense to the charge of felon in possession of a firearm.” ’ ”
Diggs, 168 So.3d at 162, quoting Ex parte Taylor, 636 So.2d at 1247, quoting in turn Blache, 480 So.2d 304.
This statement should be the rule regarding self-defense. Specifically, like the situations in Blache and Mungin, at the moment when a person- who is otherwise unable to lawfully possess a weapon finds himself or herself in imminent peril of great bodily harm, he or she should be able to lawfully take possession of a weapon at that moment and use it for a period no longer than is necessary or apparently necessary to use it in self-defense. Recognizing this rule simply recognizes the defense of justification or necessity.
On the other hand, a person should not be able to unlawfully take possession of a weapon well before an altercation occurs,. enter circumstances that may result in a violent confrontation, use that weapon in a violent altercation, and then avail himself or herself of the “no-duty-to-retreat” right created by § 13A-3-23(b). In such a situation, the defendant is engaged, in unlawful activity before it becomes necessary to do so. As such, the defendant who is illegally in possession of a firearm should be required to retreat, if retreat is possible.
Under Taylor, if a person who cannot otherwise lawfully possess a weapon arms himself or herself in self-defense, he or she can raise the defense of self-defense to a charge that he or she unlawfully possessed a weapon. As Taylor held, unlawful possession of a firearm is not a strict-liability offense. However., Taylor did not consider whether such, a person has a duty to retreat if possible, and there is no indication in § 13A-3-23 that the legislature meant to exempt such a person from the duty under the common law to retreat if possible. In fact, the opposite is true. The legislature explicitly excluded people “engaged in an unlawful activity” frdm the newly established “no-duty-to-retreat” right. Frankly, we see the wisdom in not allowing violent felons to proactively arm themselves and then avail themselves of the stand-your-ground law when they enter -a situation in which violence is likely and use the weapon-that they are unlawfully possessing to take human life. A felon who is barred from possessing a *1217 gun should be able to act in self-defense, but he or she should also have to retreat if possible.
If a person enters a situation engaged in an unlawful activity that in anyway relates to or contributes to the situation, that person cannot avail himself or herself of the “no-duty-to-retreat” right created by § 13A-3-23(b). This Court previously alluded to this understanding of the law in Kidd v. State, 105 So.3d 1261 (Ala.Crim.App.2012), in which this Court stated:
“Kidd’s unlawful possession of the firearm contributed to the argument that eventually led to the shooting. Accordingly, he was not entirely free from fault. Therefore, § 13A-3-23(h) imposed a duty to retreat upon Kidd, and the trial court’s jury instruction to that effect was appropriate.” ■
105 So.3d at 1264.
In the present case, Fuller unlawfully possessed a firearm before he drove by the house where Witherspoon was located and the altercation occurred. He then used that firearm in the altercation. We hold that Fuller was not entitled to an instruction under § 13A-3-23(b), Ala.Code 1975, informing the jury that, if he was-justified under subsection (a) in using physical force, he had no duty to retreat. We certainly do not believe the Alabama Legislature intended to avail armed violent felons of its stand-your-ground law. Accordingly, this Court holds that the trial court .did not commit reversible error when it ruled that Alabama’s “stand-your-ground” law did not apply because Fuller was engaged in unlawful activity.
II.
Next, Fuller argues that the trial court committed reversible error when it refused to charge the jury on provocation manslaughter.
This Court has stated:
“ ‘ “A person accused of the greater offense has a right to have the court charge on lesser included offenses when there is a reasonable theory from the evidence supporting' those lesser included offenses.” MacEwan v. State, 701 So.2d 66, 69 (Ala.Crim.App.1997). An accused has the right to have the jury .charged on “‘any material hypothesis which the evidence in his favor tends to establish.’ ” Ex parte Stork, 475 So.2d 623, 624 (Ala.1985). “[Ejvery accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however[ ] weak, insufficient, or doubtful in credibility,” Ex parte Chavers, 361 So.2d 1106, 1107 (Ala.1978), “even if the evidence supporting the charge is offered by the State.” Ex parte Myers, 699 So.2d 1285, 1290-91 (Ala.1997), cert. denied, 522 U.S. 1054, 118 S.Ct. 706, 139 L.Ed.2d 648 (1998). However, “[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.” § 13A-l-9(b), Ala.Code 1976. “The basis of a charge on a lesser-included offense must be derived from the evidence presented at trial and cannot be based on speculation or conjecture.”' Broadnax v. State, 825 So.2d 134, 200 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001), cert. denied, 536 U.S. 964, 122 S.Ct. 2675, 153 L.Ed.2d 847 (2002). “‘A court may properly refuse to charge on a lesser.-included offense only when (1) it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) the *1218 requested charge would have a tendency to mislead or confuse the jury.’” Williams v. State, 675 So.2d 537, 540-41 (Ala.Crim.App.1996), quoting Anderson v. State, 507 So.2d 580, 582 (Ala.Crim.App.1987).’
“Clark v. State, 896 So.2d 584, 641 (Ala.Crim.App.2000) (opinion on return to remand).”
Harbin v. State, 14 So.3d 898, 909 (Ala.Crim.App.2008).
Section 13A-6-3(a), Ala.Code 1975, provides, in pertinent part:
“A person commits the crime of manslaughter if:
[[Image here]]
“(2) He causes the death of another person under circumstances that would constitute murder under Section 13A-6-2; except, that he causes the death due to a sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself.”
In Spencer v. State, 201 So.3d 573 (Ala.Crim.App.2015), this Court stated:
“ ‘Alabama courts have, in fact, recognized three legal provocations sufficient to reduce murder to manslaughter: (1) when the accused witnesses his or her spouse in the act of adultery; (2) when the accused is assaulted or faced with an imminent assault on hiniself; and (3) when the accused witnesses an assault on q family member or close relative.’
“Rogers v. State, 819 So.2d 643, 662 (Ala.Crim.App.2001).
“In discussing what constitutes ‘imminent assault’ in regard to provocation manslaughter, this Court has stated:
““““Mere words, no matter how insulting, never reduce a homicide to manslaughter. Manslaughter is the unlawful killing of a human being without malice; that is, the unpremeditated result of passion — heated blood — caused by a sudden, sufficient provocation. And such provocation can, in no case, be less than an assault, either actually committed, or menaced under such pending circumstances as reasonable to convince the mind that the accused has cause for believing, and did believe, he would be presently assaulted, and that he struck, not in consequence of a previously formed design, general or special, but in consequence of the passion suddenly aroused by the blow given, or apparently about to be given.” ... ’ Reeves v. State, 186 Ala. 14, 65 So. 160, 161 [(1914)].” Easley v. State, 246 Ala. 359, at 362, 20 So.2d 519, 522 (Ala.1944). Thus, the mere appearance of imminent assault may be sufficient to arouse heat of passion.’
“Cox v. State, 500 So.2d 1296, 1298 (Ala.Crim.App.1986). ‘What constitutes legal provocation is left to the trial judge’s interpretation.’ Gray v. State, 574 So.2d 1010, 1011 (Ala.Crim.App.1990) (citing Shultz v. State, 480 So.2d 73, 76 (Ala.Crim.App.1985)).”
Spencer, 201 So.3d at 597.
“ ‘In addition, “[provocation has been defined as that treatment by another which arouses anger or passion, which produces in the minds of persons ordinarily constituted the highest degree of exasperation, rage, anger, sudden resentment, or terror. Johnson v. State, 129 Wis. 146, 108 N.W. 55 (1906).” Nelson v. State, 511 So.2d 225, 240 (Ala.Crim.App.1986), aff'd, 511 So.2d 248 (Ala.1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988).’” James v. State, 24 So.3d 1157, 1163 (Ala.Crim.App.2009), quoting McDowell v. State, 740 So.2d 465, 468 (Ala.Crim.App.1998). Furthermore, “[s]elf-defense and provocation manslaughter are not mutually exclusive.” James, 24 So.3d at 1164.
In the present case, according to the testimony of Fuller and his girlfriend, Fuller voluntarily stopped his vehicle and *1219 engaged in a verbal altercation with With-erspoon immediately before the shooting. According to Fuller, Witherspoon started the verbal altercation; however, “mere words, no matter how- insulting, never reduce a homicide to manslaughter,” and, again, the evidence indicated that Fuller voluntarily stopped his vehicle and joined in- the verbal altercation. Furthermore, Fuller testified that, immediately before he fired the shots that killed Witherspoon, he believed that his life and the lives of his “family” were in danger because, he said, Witherspoon pointed a gun at him. Concerning his reasoning behind firing the shots that killed Witherspoon, Fuller specifically testified:
“It was like a split second, like. I just grabbed my gun. And when I grabbed my gun, as I turned around to lean — to do like this — to—before I come up, I could see [Witherspoon] walking towards like he was already like this (indicating). It was like a split second. As soon as I seen him with that gun like, I was just like, I had to do what I had to do because of my family right there with me. As soon as I came up, I just shoot twice or whatever and like — ”
(R. 456.)
Thus, although it was a “split-second” decision, Fuller testified that the reason he fired the shots at Witherspoon was to protect himself and his “family,” i.e., Fuller testified that he decided to “do what [he] had to do” and fire the shots in self-defense. However, there was no testimony indicating that Fuller fired the shots as a result of “heated blood,” i.e., as a result of “the highest degree” of rage, terror, or anger. In other words, there was no testimony indicating that Fuller’s actions were being directed by passion rather than reason. In fact, Fuller testified that “[y]ou could say that I did it for a reason because [Witherspoon] had the gun extended.” (R. 490.) Therefore, because there was no evidence to support a provocation-manslaughter instruction, the trial court did not err in rejecting Fuller’s request to instruct the jury on provocation manslaughter. • ■
III.
Finally, Fuller argues that the trial court erroneously allowed the State to present a recording of a police interview of Fuller’s girlfriend, Smoot. Specifically, Fuller contends that the trial court erroneously admitted hearsay evidence when the court admitted the recording of the police interview.
The day after the shooting, Smoot was interviewed by two detectives at the Jefferson County Sheriffs Office. During that interview, Smoot gave a statement to the police that differed from the testimony that' she gave at trial. At trial, Smoot testified that the detectives who conducted the interview threatened her and that, because they threatened her, she told them what they wanted to hear during the interview. She further testified that the statement she gave during the interview was a lie and that she was telling the truth at trial. One of the detectives who conducted the interview testified that Smoot was not threatened. The State offered a recording of the interview for the purpose of showing that Smoot was not threatened during the interview. The trial court allowed the State to play a redacted recording of the interview for the jury, but the trial court did not allow the recording to go back to the jury room with the jury during the jury’s deliberations.
“ ‘Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Rule 801(c), Ala. R. Evid. “A ‘statement’ is (1) an oral- or written assertion or (2) nonverbal conduct of a person, if it is intended *1220 by the person as an assertion.” Rule 801(a), Ala; R. Evid.
In the present case, the State offered the ■ recording of the police interview to show the lack of threatening statements by the detectives during the interview, not as evidence of any particular statement that was made during the. interview. . None of the statements contained in -the interview were offered in evidence, to prove the truth of the matter asserted in those statements. Therefore, by definition, those, statements were not hearsay. Thus, the trial court did not err in allowing the recording of the interview to be played for the jury.
Moreover,
“[n]o judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of .misdirection of the jury, the giving or. refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.”
Rule 45, Ala. R.App. P.
“ ‘ “ ‘[Tjestimony that may be inadmissible may be rendered harmless by prior or subsequent lawful" testimony to the same effect or from which the same facts can be inferred.’ White v. State, 650 So.2d 538, 541 (Ala.Cr.App.1994), overruled on other grounds, Ex parte Rivers, 669 So.2d 239 (Ala.Cr.App.1995).... ‘The erroneous admission of evidence that is merely cumulative is harmless error.’ Dawson v. State, 675 So.2d 897, 900 (Ala.Cr.App.1995).” ’
“Gavin v. State, 891 So.2d 907, 970 (Ala.Crim.App.2003), quoting Flynn v. State, 745 So.2d 295, 307 (Ala.Crim.App.1999).” Brownfield v. State, 44 So.3d 1, 20-21 (Ala.Crim.App.2007).
In the present case, before the recording of the interview was played for the jury, Smoot testified that her trial testimony differed from her statement to the police and that she had lied to the detectives during the interview, and testimony was presented concerning statements that were made during the interview. Thus, it appears that much of the substance of the recording was cumulative of prior testimony. Furthermore, before the recording was played for the jury, the trial court redacted portions of the recording that would have been improper for the jury to hear. Also, Fuller does not state how the admission of the recording prejudiced his defense. Accordingly, this Court finds that, even if the trial court erroneously allowed the recording to be played for the jury, it does not appear that the admission of the redacted recording probably injuriously affected Fuller’s substantial rights. Therefore, any error in the admission of the redacted recording was harmless and does not provide a ground for reversal of the trial court’s judgment. '

Conclusion

Based on the foregoing, we affirm the trial court’s judgment.
AFFIRMED.
WINDOM, P.J., and WELCH and JOINER, JJ., concur.
KELLUM, J., concurs in part and dissents in part, with opinion.

. Evidence was presented to the trial court outside the presence <jf the jury indicating that Fuller has a prior felony conviction for first-degree robbery. (R. 35S.) The version of § 13A-1 l-72(a), Ala.Code 1975, that was in effect at the time of the events in the present case provided that "[n]o person who has been *1212 convicted in this state or elsewhere of committing or attempting to commit a crime of violence shall own a pistol or have one in his or her possession or under his or her control,” First-degree robbery is a "crime of violence” for the purposes of§ 13A-ll-72(a). See § 13A — 11—70(2), Ala.Code 1975.