RENDERED: SEPTEMBER 18, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2022-SC-0560-MR

RAIANTEZ SHACKLES                                   APPELLANT

V.

ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE MITCHELL PERRY, JUDGE
NOS. 21-CR-000403 & 22-CR-001928

COMMONWEALTH OF KENTUCKY                      APPELLEE

**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING</u>**

A Jefferson County jury found Raiantez Shackles ("Shackles") guilty of two counts of first-degree assault, six counts of first-degree wanton endangerment, possession of a handgun by a felon, and of being a first-degree persistent felony offender. It fixed his punishment at sixty years' imprisonment. The Jefferson Circuit Court reduced the total sentence from sixty years to forty-five years pursuant to Kentucky Revised Statute ("KRS") 532.070(1). Shackles now appeals as a matter of right and challenges his convictions. *See* KY. CONST. § 110(2)(b). Having reviewed the record, the arguments of the parties, and the applicable law, we affirm the Jefferson Circuit Court.

## I. BACKGROUND

Cassandra Yarbrough ("Cassandra") and Marvin Yarbrough ("Marvin") have been married since around 2014 or 2015. The pair (collectively the

"Yarbroughs") have four children together. At the time of the events at issue, the children were seven years old, five years old, three years old, and eleven months old, respectively.

Marvin and Shackles grew up together and were childhood friends. Their long-term friendship began to crumble, however, in October 2020, when Marvin and Shackles travelled to Indianapolis, Indiana, together to perform at a hip-hop show. While there, the two argued about what songs each would perform. The feud only escalated when everyone returned home to Louisville. Marvin and Shackles exchanged threats. As a result of the threats, Marvin and Cassandra briefly resided with a relative in a different neighborhood. Around this time, Marvin also learned that his wife, Cassandra, had engaged in a sexual relationship with Shackles.

In 2021, Marvin and Cassandra lived across the way from Jessica Yarbrough ("Jessica") in Louisville, Kentucky. Jessica is Marvin's paternal cousin and was in a romantic relationship with Shackles. On the night of January 4, 2021, unknown individuals fired gunshots at Shackles's and Jessica's vehicles. Jessica filed a police report, where she listed her phone number and Shackles's phone number. At trial, Cassandra testified that on this night, she had people over at her home to comfort her as she grieved the recent death of her aunt, whose funeral was set for the next day. During this gathering, Marvin noticed that one of their guns was missing. The bullets fired at Shackles's and Jessica's vehicles were later tied to the Yarbroughs' missing gun.

The next morning, January 5, 2021, Marvin and Cassandra went to Cassandra's aunt's funeral. They brought their youngest child, the eleven-month-old, with them to the funeral, while Marvin's younger brother, Terrion Trotter ("Terrion"), babysat their three older children. Marvin and Cassandra were only at the funeral for approximately an hour before Cassandra began receiving a multitude of texts and calls from Terrion saying that someone was trying to break into the home. As a result, Marvin and Cassandra rushed home.

Upon their arrival back to their apartment, two armed men approached them. Cassandra could not definitively identify the men, but she could tell that they were armed. The men spoke to Marvin while Cassandra rushed to put their baby in the apartment. Marvin's and Cassandra's three older children, along with Marvin's younger brother, were inside their home. When Cassandra returned outside, she saw Shackles emerge from behind the tree in front of their apartment. She testified that Shackles clearly had a weapon and pointed it at her and Marvin. Cassandra was standing on the landing of the apartment while Marvin was standing in the doorway. It was at this moment that "the shots started firing." Cassandra attempted to return fire but was shot before she could do so. Marvin was also shot, and both individuals stumbled back into their apartment. Neither party disputes that Cassandra and Marvin lawfully owned their firearms.

Nicole Foree ("Foree"), Marvin's aunt, frequently visited Marvin and Cassandra at their home. On January 5, 2021, she decided to stop by their

3

home to visit with the Yarbrough children. She arrived at the scene to find the wounded Yarbroughs laying in the doorway of their home. Foree attempted to help by applying pressure to Marvin's wound before emergency responders arrived.

Officer Aaron Ambers and Officer Dave Thomas arrived at the scene shortly thereafter. Officer Ambers assessed the scene and rendered aid to the gunshot wounds Marvin had sustained to his leg. Officer Thomas administered aid to Cassandra, who had sustained a gunshot wound to her pelvic area. Marvin and Cassandra were then transported by ambulance to University of Louisville Hospital.

None of the Yarbroughs' children were injured in the shooting. The eleven-month-old was located in the kitchen on the main floor of the home, while the three elder children were in a second-floor bedroom. Terrion hid in the living room on the main floor of the home.

After law enforcement secured the scene, they located multiple bullet holes in the brick surrounding the doorway and throughout the home. Vickie Williams, a neighbor of the Yarbroughs, testified that bullets had also entered her home and her bedroom.

Sergeant Joseph Fox, a detective at the time of the shooting, was assigned to investigate the case. Sergeant Fox analyzed a variety of evidence from the scene, including used shell casings and a cellphone located near the tree in front of the Yarbroughs' home. After assessing the evidence and hearing

that Cassandra had identified Shackles as the shooter, Sergeant Fox arrested Shackles on January 20, 2021.

At trial, neither Shackles nor Marvin testified. Cassandra was the only witness to testify as to what occurred in the face-off between Marvin and Shackles. However, a video of Marvin's interview with police following the incident was admitted into evidence. In this video, Marvin admits that he drew his weapon first, and that he would have fired at Shackles first if the safety had not been on.

Following the guilt phase of the trial, the jury found Shackles guilty of two counts of first-degree assault, six counts of first-degree wanton endangerment, possession of a handgun by a felon, and of being a first-degree persistent felony offender. After the sentencing phase, the jury recommended that Shackles receive a sixty-year sentence. The trial court reduced that sentence to forty-five years pursuant to KRS 532.070(1).

Additional facts will be developed below as necessary.

## II.    ANALYSIS

Shackles raises seven allegations of error in seeking reversal. Shackles argues that the trial court erred by: (1) declining his request for a self-defense instruction; (2) permitting Sergeant Fox to rely on an online report in identifying Shackles's phone number; (3) allowing the Commonwealth to play a clip from a responding officer's body camera wherein Cassandra identified Shackles as the shooter; (4) admitting cumulative gruesome videos and photographs; (5) denying his motions for directed verdicts on the three charges

5

of first-degree wanton endangerment related to the three elder Yarbrough children; (6) failing to issue an unanimity instruction in the penalty instructions; and (7) permitting Cassandra to testify to Shackles' threats during the sentencing phase. We address each argument in turn.

## A. The trial court did not err in declining Shackles's request for a self-defense instruction.

Shackles sought and was denied a self-defense instruction. "A decision to give or to decline to give a particular jury instruction inherently requires complete familiarity with the factual and evidentiary subtleties of the case that are best understood by the judge overseeing the trial from the bench in the courtroom." *Sutton v. Commonwealth,* 627 S.W.3d 836, 848 (Ky. 2021). In turn, "[w]hen the question is whether a trial court erred by: (1) giving an instruction that was not supported by the evidence; or (2) not giving an instruction that was required by the evidence; the appropriate standard for appellate review is whether the trial court abused its discretion." *Sargent v. Shaffer,* 467 S.W.3d 198, 203 (Ky. 2015), *overruled on other grounds by Univ. Med. Ctr., Inc. v. Shwab,* 628 S.W.3d 112 (Ky. 2021).

A trial court is required to instruct the jury on affirmative defenses if the evidence would permit a juror to reasonably conclude that the defense exists. *Fredline v. Commonwealth,* 241 S.W.3d 793, 797 (Ky. 2007); *Nichols v. Commonwealth,* 142 S.W.3d 683, 689 (Ky. 2004). Self-defense is an affirmative defense. *See generally Turner v. Commonwealth,* 544 S.W.3d 610, 625–26 (Ky. 2018). While "[t]rial courts have a duty to instruct the jury on the whole law[,] .

6

. . that duty does not extend to placing speculative theories before the jury merely because the testimony includes some basis for the speculation." *Daniel v. Commonwealth*, 607 S.W.3d 626, 644 (Ky. 2020) (citing *Lackey v. Commonwealth*, 468 S.W.3d 348, 355 (Ky. 2015)). A jury instruction on self-defense "is necessary once sufficient evidence has been introduced at trial which could justify a reasonable doubt concerning the defendant's guilt." *Hilbert v. Commonwealth*, 162 S.W.3d 921, 925 (Ky. 2005), *superseded on other grounds by* KRS 503.055, 505.050(4). In determining whether sufficient evidence exists in the record to substantiate a self-defense instruction, we have made clear that:

> It is not every assertion of such belief that is adequate to support a plea of self-defense. It is the **whole circumstances** which surround the incident that must be considered by the trial judge in deciding whether an instruction on self-defense is proper or whether an instruction on self-defense with limitations is proper.

*Downs v. Commonwealth*, 620 S.W.3d 604, 614 (Ky. 2020) (quoting *Stepp v. Commonwealth*, 608 S.W.2d 371, 374 (Ky. 1980)) (emphasis added).

Kentucky has codified when an individual may justifiably use force in self-defense. KRS 503.050(1) provides that "[t]he use of physical force by a defendant upon another person is justifiable when the defendant believes that such force is necessary to protect himself against the use or imminent use of **unlawful** physical force by the other person." (emphasis added).  KRS 503.055(3) states:

> A person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and meet

7

force with force, including deadly force, if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a felony involving the use of force.

KRS 503.060 stipulates that an individual is not justified in using physical force upon another where the defendant is resisting arrest by a peace officer, provoking the use of physical force by the other person, or where the defendant was the initial aggressor of the conflict.

In *Berry v. Commonwealth*, Eric Berry was convicted of first-degree burglary, first-degree sexual assault, two counts of fourth-degree assault, first-degree fleeing or evading, and resisting arrest for his violent invasion into Kimberly Alford's home and ensuing assault of its occupants. 680 S.W.3d 827, 832–33 (Ky. 2023). On appeal before this Court, Berry argued that there was sufficient evidence to warrant a voluntary intoxication instruction. *Id.* at 837. While we acknowledged that there was sufficient evidence to justify an inference that Berry was intoxicated, we noted that the precise question was whether his intoxication was so excessive that he could not form the intent to commit a crime in the context of first-degree burglary. *Id.* at 838. At trial, the victim's daughter testified that she did not believe that Berry knew what he was doing when he assaulted her mother. *Id.* at 839. Berry argued that this was sufficient to trigger the voluntary intoxication instruction. *Id.* This Court disagreed, explaining that,

> Upon review, we cannot hold that one, out-of-context piece of testimony satisfies Berry's burden of proof to put forth evidence reasonably sufficient to prove he did not know what he was doing as

8

a result of intoxication to such a degree that the failure to give an intoxication instruction was an abuse of discretion.

*Id.* at 840.

Turning now to the case before us, the evidence concerning the actual incident at issue is scarce. At trial, Cassandra was the only witness to testify to what occurred in the face-off between Shackles and the Yarbroughs. Cassandra testified that she and Marvin were attending a funeral with their baby when they received text messages from Marvin's younger brother, who was babysitting the Yarbroughs' three older children, that two men were banging on their front door. Cassandra and Marvin rushed home. Upon their arrival back to their apartment, two armed men approached them. The men spoke to Marvin while Cassandra rushed to put their baby in the apartment. Marvin and Cassandra's other three older children, along with Marvin's younger brother, were also in the apartment.

When Cassandra returned outside, she saw Shackles emerge from behind the tree in front of their apartment. She testified that Shackles clearly had a weapon and pointed it at her and Marvin. Cassandra was standing on the landing of the apartment while Marvin was standing in the doorway. It was at this moment that "the shots started firing." Cassandra attempted to return fire but was shot before she could do so. Marvin was also shot, and both individuals stumbled back into their apartment.

Shackles cites the video of Marvin's interview with police in which he admitted that he would have fired first but for the safety, and Cassandra's

equivocal testimony regarding who shot first, as sufficient evidence to warrant a self-defense instruction. This conclusion overlooks the explicit statutory language requiring that the individual claiming self-defense be acting in response to the use of *unlawful* physical force.

It is true that the bar for the giving of an affirmative instruction is relatively low, and that "the evidence supporting [the defendant's] belief in the need for the use of force [need] not [be] strong, nor free from contradiction." *Hilbert*, 162 S.W.3d at 925. However, the complete absence of evidence differs from the existence of contradictory evidence. The language of KRS 503.050(1) plainly and unequivocally states that a criminal defendant may *only* use force to protect himself against the *unlawful* physical force of another. Simply put, there is no evidence that Marvin used any *unlawful* physical force. Further, in fact, he was engaged in presumably *lawful* force in the protection of his home and family. Our statutory language is clear: an individual who is not engaging in unlawful conduct and who is in a place where he has a right to be "has the right to stand his . . . ground and meet force with force, including deadly force, if he . . . reasonably believes it is necessary to do so to prevent death or great bodily harm to himself[.]" KRS 503.055(3). Indeed, "[w]here a statute is plain and unambiguous on its face, we are not at liberty to construe the language otherwise[.]" *Pennyrile Allied Cmty. Servs., Inc. v. Rogers*, 459 S.W.3d 339, 343 (Ky. 2015).

Here, the parties do not dispute that Marvin had legal ownership of his weapon, nor do they dispute that Marvin was standing in the doorway of his

10

and Cassandra's apartment, where his four children were also located, when the shootout occurred. In the lead-up to the shooting, two armed men, who had aligned themselves with Shackles, acted menacingly toward Marvin, his wife, and his four young children. Shackles then jumped out from behind a nearby tree and pointed a gun at Marvin and Cassandra. The act of pointing a gun at another is sufficient to constitute "force" under KRS 503.055(3). *See Bowman v. Commonwealth*, 686 S.W.3d 230, 248 (Ky. 2024) (holding that the "act of pointing a gun at [another] was sufficient to satisfy KRS Chapter 503's definition of 'physical force' because it constituted force 'directed toward' the body of another"). In turn, given the absence of evidence produced to the contrary, Marvin's use of force was presumably lawful under KRS 503.055(3) because Shackles pointed his weapon at the Yarbroughs, Marvin stood in the doorway of his own home, and Marvin was not engaged in any otherwise unlawful activity. The defense put forth no evidence to prove that Shackles's force was in response to any *unlawful* use of force by Marvin as required by KRS 503.050(1).

In *Curry v. Commonwealth*, we assessed whether a trial court had abused its discretion when it declined to give the jury a stand-your-ground instruction due to the defendant's engagement in an unlawful activity. 620 S.W.3d 563, 569 (Ky. 2020). There, the defendant, Curry, was lawfully in the victim's apartment when the two got into an argument. *Id.* at 566. Curry alleged that he feared the victim, and that when the victim started coming toward him, he picked up a gun he saw sitting on the couch and shot the victim. *Id.* Curry

11

claimed that he did not know where the gun came from and that it was not his. *Id.* Importantly, Curry was a convicted felon, and it is a felony under Kentucky law to be a convicted felon in possession of a firearm. *Id.* at 569–70.

Ultimately, this Court concluded that Curry was not entitled to a stand-your-ground instruction in addition to a self-defense instruction because the second he picked up the gun, Curry became a felon in possession of a firearm and was thereby engaging in an unlawful activity. *Id.* at 571. We emphasized the importance of adhering to the clear statutory language of KRS 503.055, which, in relevant part, requires that the defendant was "not engaged in unlawful activity" at the time he used the force against another. *Id.*

*Curry* provides prudent guidance for this Court in the matter before us. Though it concerned a trial court's refusal to give a stand-your-ground instruction in addition to a self-defense instruction, it likewise upholds the premise that all requirements of the pertinent self-defense statute must be met prior to the giving of the corresponding instruction. In *Curry*, the defendant was not entitled to a stand-your-ground instruction because he had engaged in an unlawful activity and was thus disqualified under the statute. Here, KRS 503.050(1) only permits a defendant to use force when he "believes that such force is necessary to protect himself against the use or imminent use of unlawful physical force by the other person." Thus, KRS 503.050(1) requires that the defendant "believe such force is necessary to protect himself" *and* that his force be in response to "unlawful physical force by the other person" before the provisions of the statute apply. Even if Marvin had fired his weapon first,

12

he was entitled to do so under KRS 503.055, as he was in the doorway of his own home protecting his wife and four children from Shackles.

Though the bar for jury instructions is low, it still requires that there be sufficient evidence in the record to substantiate the instruction. *Stepp,* 608 S.W.2d at 374. That requirement is simply not met here. Indeed, as we have noted in the past, "if the evidence in this case—which amounts to one snippet of out-of-context testimony—is enough, then there is in fact no bar at all." *Berry*, 680 S.W.3d at 840. Any alleged force used by Marvin was lawful, and the defense failed to put forth any evidence to suggest otherwise. The trial court did not abuse its discretion in deciding not to give Shackles a self-defense instruction.[1] Its decision was not "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999).

**B. While the trial court erred in permitting Sergeant Fox to rely on the online report in identifying Shackles's phone number, the error was harmless.**

Shackles argues that Sergeant Fox's testimony that he relied upon a report from an online database identifying Shackles's phone number in determining the ownership of a cell phone recovered from the scene of the crime should have been excluded as impermissible hearsay. Shackles properly preserved this issue through his contemporaneous objection to Sergeant Fox's

---

[1] To be clear, this is not to say that being a felon in possession of a firearm will always preclude an individual from obtaining a self-defense instruction. *See Curry,* 620 S.W.3d at 575 (Keller, J., concurring in part, dissenting in part).

13

testimony. We therefore review this issue under the abuse of discretion standard. "Rulings upon admissibility of evidence are within the discretion of the trial judge; such rulings should not be reversed on appeal in the absence of a clear abuse of discretion." *Simpson v. Commonwealth,* 889 S.W.2d 781, 783 (Ky. 1994). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English,* 993 S.W.2d at 945.

Pursuant to Kentucky Rule of Evidence ("KRE") 801(c), "'[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "Hearsay is not admissible except as provided by these rules or by rules of the Supreme Court of Kentucky." KRE 802.

At trial, the Commonwealth sought to admit evidence attributing a specific phone number as belonging to Shackles. The Commonwealth began its endeavor by calling Officer Phillip Renaud. On January 5, 2021, Jessica called 911 to report that someone had fired multiple rounds into her and Shackles's cars. Officer Renaud responded to the call and spoke with Jessica at the scene. Officer Renaud testified that in the corresponding police report, Jessica identified Shackles as the owner of one of the damaged vehicles and provided his phone number.

Later, the Commonwealth then called Sergeant Fox, the lead detective in the case. Sergeant Fox testified that he retained possession of a cell phone that had been recovered by police officers from the scene following the shootout

14

between Shackles and the Yarbroughs. Based upon Cassandra's identification of Shackles as the shooter, Sergeant Fox searched for Shackles in an online database, and located the phone number that Jessica had attributed to Shackles in the January 2021 police report. Sergeant Fox called the phone number, and the cell phone that police had recovered from the scene rang. Sergeant Fox testified that the identification of that phone number as belonging to Shackles in the online database constituted the basis for his belief that the cell phone belonged to Shackles.

We faced similar circumstances in *Wiley v. Commonwealth*, 348 S.W.3d 570 (Ky. 2010). There, this Court held that a trial court abused its discretion when it permitted a detective to testify that a Social Security number belonged to the defendant, Allen Wiley, III. *Id.* at 580. Wiley entered a U.S. Bank, and when asked for his account number, gave the teller his Social Security number instead. *Id.* at 573. The teller informed Wiley that he did not have an account with the bank. *Id.* In response, Wiley forced the teller to give him all the money in the teller drawer. *Id.* The teller was the only witness to the robbery and could not identify Wiley. *Id.*

The detective then testified that the Social Security number that the robber gave to the teller belonged to Wiley. *Id.* at 580. While the trial court sustained defense counsel's objection to the detective citing the National Crime Information Center as his source, it later overruled a subsequent objection to the detective's testimony that he had attributed the Social Security number to Wiley through unnamed "other sources." *Id.* This Court held that the

15

detective's assertion that the Social Security number belonged to Wiley based on "other sources" was impermissible hearsay, as it was offered to prove the truth of the matter asserted and no business records were introduced to support the testimony. *Id.*

Here, Sergeant Fox's testimony that he relied upon a police report from an online database in determining that the cell phone recovered from the scene belonged to Shackles constitutes hearsay, as it involves an out of court statement (the identification of Shackles's phone number in the online report) that is offered to prove the truth of the matter asserted (that the phone number, and the corresponding cell phone, do in fact belong to Shackles). KRE 801(c). Akin to the detective in *Wiley*'s attribution of the Social Security number to the defendant based on unnamed "other sources," Sergeant Fox's testimony that he identified the ownership of the cell phone through a report on an online database likewise constitutes hearsay. Indeed, "[t]he assertion that the information was 'gleaned' from 'other sources,' assumedly online databases, does not exclude it from being a statement for the purposes of the hearsay rule." *Wiley*, 348 S.W.3d at 580.

The Commonwealth proffers no exception under which this hearsay may be permitted, nor can we discern one. Accordingly, we must hold that the trial court erred when it allowed Sergeant Fox to testify that he had relied upon a report from an online database in determining that the cell phone recovered from the scene belonged to Shackles.

16

However, per Kentucky Rule of Criminal Procedure ("RCr") 9.24, this Court "will deem an error in the admittance of evidence harmless 'if [it] can say with fair assurance that the judgment was not substantially swayed by the error.'" *Saxton v. Commonwealth*, 671 S.W.3d 1, 14 (Ky. 2022) (quoting *Brown v. Commonwealth*, 313 S.W.3d 577, 595 (Ky. 2010)). "Our inquiry is not simply 'whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'" *Brown*, 313 S.W.3d at 595 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

Here, it is evident that Sergeant Fox's testimony connecting Shackles to the cell phone found at the scene of the crime did not substantially sway the judgment. Cassandra's testimony explicitly identified Shackles as the shooter and placed him at the scene of the crime. Further, in the video of his interview with police, Marvin also identified Shackles as the shooter. The mere connection of Shackles to a cell phone found at the scene of the crime is inconsequential compared to the other evidence presented by the Commonwealth. This error, therefore, was harmless.

Because we deem Sergeant Fox's testimony to violate the hearsay prohibition, we need not reach the merits of Shackles's argument that Sergeant Fox's testimony violated his rights under the Confrontation Clause.

17

## C. The trial court did not err in permitting the Commonwealth to play a clip from a responding officer's body camera wherein Cassandra identified Shackles as the shooter.

Shackles argues that the footage from Officer Thomas' body camera was inadmissible hearsay that improperly bolstered Cassandra's identification of Shackles. Shackles preserved this issue at trial, and we therefore review it under the abuse of discretion standard. "Rulings upon admissibility of evidence are within the discretion of the trial judge; such rulings should not be reversed on appeal in the absence of a clear abuse of discretion." *Simpson*, 889 S.W.2d at 783. "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945.

At trial, Officer Thomas testified that he was one of the officers who responded to the initial 911 call regarding the exchange of gunfire between Shackles and the Yarbroughs. Officer Thomas testified that he assessed the scene and rendered aid to Cassandra. The Commonwealth then played footage from Officer Thomas' body camera. The footage showed his approach to the scene of the crime and his administration of aid to Cassandra as she laid bleeding in her home's foyer. As Officer Thomas cut away Cassandra's clothing to assess her gunshot wound, Cassandra can be heard groaning in pain and stating "it hurts so bad" repeatedly. Officer Thomas then asked Cassandra what had happened, to which she responded that "Somebody came over here, and they had guns. We just left the funeral, and they started shooting." Officer

18

Thomas then asked Cassandra if she knew who it was and what their name was. Cassandra responded, "Raiantez Shackles."

Pursuant to KRE 803(2), "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is excepted from the hearsay prohibition. The rationale for this exception is that "statements made under the stress of the excitement caused by a startling occurrence are more likely the product of that excitement and, thus, more trustworthy than statements made after the declarant has had an opportunity to reflect on events and to fabricate." *Noel v. Commonwealth*, 76 S.W.3d 923, 926 (Ky. 2002). Accordingly, for an out-of-court statement to qualify for admission under KRE 803(2), "it must appear that the declarant's condition at the time was such that the statement was spontaneous, excited, or impulsive rather than the product of reflection and deliberation." *Id.* (quoting *United States v. Iron Shell*, 633 F.2d 77, 86 (8th Cir. 1980)).

Whether an out-of-court statement is "spontaneous" for purposes of KRE 803(2) depends on the specific circumstances under which it was made, with the following circumstances "most significant":

> (i) lapse of time between the main act and the declaration, (ii) the opportunity or likelihood of fabrication, (iii) the inducement to fabrication, (iv) the actual excitement of the declarant, (v) the place of the declaration, (vi) the presence there of visible results of the act or occurrence to which the utterance relates, (vii) whether the utterance was made in response to a question, and (viii) whether the declaration was against interest or self-serving.

19

*Souder v. Commonwealth*, 719 S.W.2d 730, 733 (Ky. 1986); *see also Noel*, 76 S.W.3d at 926; *Jarvis v. Commonwealth*, 960 S.W.2d 466, 470 (Ky. 1998). These criteria serve only as a guideline for admissibility and are not a bright-line test. *Jarvis*, 960 S.W.2d at 470. Simply put, the statement must be made in response to an occurrence which is "startling enough to halt reflective faculties." Robert Lawson, *The Kentucky Evidence Law Handbook* § 8.60[3][b] (LexisNexis Matthew Bender 2023) (quoting Paul C. Giannelli, *Understanding Evidence* 485 (3d ed. 2009)).

Cassandra's statements in Officer Thomas' body camera footage clearly satisfy the requirements for admission pursuant to KRE 803(2). Cassandra suffered an occurrence "startling enough to halt reflective faculties" when she was shot. *See Soto v. Commonwealth*, 139 S.W.3d 827, 860–61 (Ky. 2004) (holding that sustaining a gunshot wound is a sufficiently startling event under the excited utterance exception). There was little time between Cassandra experiencing the gunshot wound and her statements. Cassandra can be heard groaning in pain and can be seen laying on the ground as she clearly presents the "visible results of the act or occurrence to which [her] utterance relates[.]" *Souder*, 719 S.W.2d at 733.

While the fact that Cassandra's statement was made in response to Officer Thomas's inquiry certainly bears on its spontaneity, such a circumstance is not determinative. *Estes v. Commonwealth*, 744 S.W.2d 421, 426 (Ky. 1987). Indeed, where "the questions were brief and not suggestive, and the declarant remained agitated[,]" the declarant's responsive statement

20

may still very well qualify as an excited utterance pursuant to KRE 803(2). *Ernst v. Commonwealth*, 160 S.W.3d 744, 755 (Ky. 2005). Here, Officer Thomas' questions were open-ended and operated simply to discern what had happened. Further, Cassandra clearly remained in an agitated state. Her statements in Officer Thomas's body camera footage clearly fall under KRE 803(2).

Shackles further takes particular issue with Cassandra's identification of Shackles as the shooter, claiming that its admission was improper under KRE 801A(a)(3), and even if it was admissible under KRE 803(2), its prejudicial value substantially outweighed any probative value. Alleged hearsay need only satisfy one exception to the hearsay prohibition for proper admissibility. Here, Cassandra's statements satisfy the requirements of KRE 803(2) and therefore were properly admitted. Furthermore, we are satisfied that the probative value of their admission substantially outweighs their prejudicial value. KRE 403. Officer Thomas' body camera footage was relevant to show the extent of the blood splattering and condition and placement of the victims. *See Wheeler v. Commonwealth*, 121 S.W.3d 173, 183 (Ky. 2003). The only prejudice alleged here was that Cassandra's statements in the video identified Shackles as the shooter. Cassandra testified to this very fact earlier in the trial. We perceive no reality in which this video's alleged prejudice substantially outweighs its probative value. The trial court did not abuse its discretion in permitting the admission of Cassandra's statements in Officer Thomas' body camera footage.

**D. The trial court did not err in admitting video and photographic evidence of the crime scene.**

As his final evidentiary concern, Shackles alleges that the trial court erred when it permitted the admission of body camera footage of the wounded Yarbroughs and eight photographs of the crime scene. He argues that the audio of Nicole Foree's cries in the body camera videos and the depictions of the bloody aftermath of the gun fight were unnecessarily gruesome and cumulative such that their probative value was substantially outweighed by the danger of undue prejudice. KRE 403. Because Shackles properly preserved these issues, we review for abuse of discretion.

While evidence depicting portrayals of a crime or of a victim may often be gruesome and thereby prejudicial to the defendant, it is generally admissible so long as it is relevant. *Parker v. Commonwealth*, 952 S.W.2d 209, 212–13 (Ky. 1997); *see also Carson v. Commonwealth*, 382 S.W.2d 85, 90 (Ky. 1964) ("Even though the admission of a photograph may arouse passion, or bring to mind vividly the details of a shocking crime, if the picture serves to illustrate a material fact or condition, it is considered admissible."). Because the Commonwealth must prove the *corpus delicti*, such evidence is frequently relevant to show the nature of the injuries inflicted by the defendant upon the victim. *Adkins v. Commonwealth*, 96 S.W.3d 779, 794 (Ky. 2003). However, even where gruesome evidence is relevant, the trial court is not relieved of its gatekeeper role under KRE 403. "The trial judge is always required to weigh the probative value of the gruesome [evidence] in question against the harmful

22

effects that might flow from its admission to determine whether the [evidence] should be excluded notwithstanding the general rule." *Hall v. Commonwealth*, 468 S.W.3d 814, 823 (Ky. 2015) (citing *Adkins*, 96 S.W.3d at 794).

Here, Shackles objects to the trial court's admission of two videos and eight photographs. The two videos consist of Officer Ambers' body camera footage and Officer Thomas' body camera footage.

Officer Ambers' body camera footage is two minutes and seven seconds long. It begins with Officer Ambers pulling up to the scene, exiting his patrol vehicle, and running up the steps of the Yarbroughs' home. Marvin and Cassandra appear in the clip approximately one minute into the footage. Both are laying on the floor just inside the entryway of their home. Marvin lays on his back and clutches the wound on his thigh. Cassandra lays on her side and clutches the wound in her pelvic area. Both Cassandra and Marvin are wearing black clothing, and thus any blood coating their clothing is not discernible. As Officer Ambers enters the Yarbroughs' home, blood splatter can be seen smeared on the walls behind Marvin and Cassandra. Foree can be seen tending to Marvin and crying. At the very end of the video, Officer Ambers asks Marvin where he was injured and begins to render aid by pulling down Marvin's black sweatpants. Though red blood can be seen on Marvin's leg briefly, his actual gunshot wound does not appear in the video.

While Officer Thomas' body camera footage also details his response to the shooting and appraisal of the scene, the focus centers around Officer Thomas' assessment of Cassandra rather than Marvin. It is five minutes and

23

twenty seconds long. It begins with Officer Thomas arriving at the scene. Approximately two minutes in, the video shows Cassandra and Marvin lying inside the doorway of their apartment. Foree can be heard crying in the background as Cassandra groans in pain. Officer Ambers can be seen pulling off Marvin's black sweatpants to administer aid to Marvin's wound. As Officer Ambers places his hand over Marvin's wound, Marvin's exposed genitals are briefly visible. The focus of the footage then turns back to Cassandra, and Officer Thomas can be heard asking her basic questions about what had happened. Cassandra responds between grunts of pain. Officer Thomas cuts off her black sweatshirt and sweatpants to render aid. Cassandra's bare stomach and gray underwear are visible. Blood can be seen in her groin area. Officer Thomas tells Cassandra where to apply pressure. She complies. Due to the angle of the camera, Cassandra's wound is never clearly visible.

The eight photographs at issue include various depictions of the entryway of the Yarbroughs' home following the shooting. The photographs were admitted as Commonwealth's Exhibits 51–56 and 58–59. Exhibit 51 is taken from the Yarbroughs' front door and shows the area where the Yarbroughs laid injured following the shooting. Their front door is open. On the left, a staircase leads to the second floor of the home. On the right is a hallway that leads to the back portion of the home. There is a narrow wall that separates the staircase from the hallway. In the small area in front of the stairs and the hallway, there are clothes and trash strewn haphazardly across the floor. Blood splatter is visible on the bottom step of the staircase, on the wall

24

separating the staircase from the hallway, on the base of the hallway wall, and on the floor immediately in front of and next to the staircase. The blood present on the floor is not so voluminous that it covers the entire floor, nor is there enough for it to have pooled anywhere. Exhibit 52 shows the Yarbroughs' entryway from the same perspective but provides a more zoomed-in portrayal of the bloody area at the base of the staircase. Exhibit 53 is also taken from the entry door, but it does not show the floor and instead focuses on the entirety of the staircase. Exhibit 54 shows a closer perspective of the bottom half of the staircase and the base of the stairs. Exhibit 55 provides a closer perspective of the clothes, shoes, trash, and blood located on the floor of the Yarbroughs' home. Exhibit 56 shows the blood smeared on the wall separating the staircase from the hallway and a different perspective of the hallway such that additional blood can be seen on a far wall leading away from the front of the home. Exhibit 58 shows the base of the staircase, with the aforementioned blood, clothes, and trash, from directly above the scene rather than from the front door. Finally, Exhibit 59 is taken from the perspective of a person standing in the Yarbroughs' back hallway and looking toward the front of the home. On the right, the photograph shows blood smeared on the wall and blood located on the floor amongst various pairs of shoes. On the left, in what appears to be an adjoining room, a pool of blood is visible.

The trial court did not abuse its discretion in admitting the above evidence. The officers' body camera footage was clearly relevant to illustrate the immediate aftermath of the crime. The fact that Foree can be heard crying in

the background is de minimis and cannot be said to unfairly prejudice Shackles in any way. Foree's cries were a natural part of the crime scene as it unfurled. Neither the officers' body camera footage nor the photographs were unduly gruesome. The officers' body camera videos never explicitly showed the Yarbroughs' injuries. While Officer Ambers could briefly be seen applying pressure to Marvin's wound in Officer Thomas' body camera video, and both videos featured visible blood smeared on the walls and floor, the videos did not linger on the minimal gore and instead simply portrayed what occurred in the immediate aftermath of the shooting.

Furthermore, the photographs at issue served as accurate depictions of the crime scene that showed the location and relationship of the evidence. Each photograph portrayed a different angle of the crime scene, and each had a separate focal point. Shackles's argument that this evidence ran afoul of KRE 403 simply because there was no dispute that the Yarbroughs were shot lacks merit. It was incumbent upon the Commonwealth to prove all elements of the charged crimes, notably that the Yarbroughs sustained "serious physical injur[ies]" under the first-degree assault charge. The photographs and the body camera footage were clearly necessary to prove this element. Accordingly, the evidence was directly probative of a material fact at issue, and we cannot say that the blood splatter and minimal exposure to the Yarbroughs' wounds were "so inflammatory that their probative value is substantially outweighed by their prejudicial effect." *Adkins*, 96 S.W.3d at 794. We affirm the trial court on this ground.

26

**E. The trial court did not err in denying directed verdicts on the three charges of first-degree wanton endangerment of the three elder Yarbrough children.**

Shackles argues that the trial court erred in denying his motion for a directed verdict on the three counts of wanton endangerment in the first degree. This Court stated the standard for directed verdicts in *Commonwealth v. Benham*:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

816 S.W.2d 186, 187 (Ky. 1991). "So long as the Commonwealth produces more than a mere scintilla of evidence to support the charges, a defendant's motion for directed verdict should be denied." *Taylor v. Commonwealth*, 617 S.W.3d 321, 324 (Ky. 2020). "On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Benham*, 816 S.W.2d at 187.

Under KRS 508.060(1), "[a] person is guilty of wanton endangerment in the first degree when, under circumstances manifesting extreme indifference to the value of human life, he or she wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person." "Firing a weapon in the immediate vicinity of others is the prototype of first-

27

degree wanton endangerment." *Swan v. Commonwealth*, 384 S.W.3d 77, 102 (Ky. 2012) (quoting Robert G. Lawson & William H. Fortune, *Kentucky Criminal Law* § 9–4(b)(2) at 388, and n. 142 (1998)) (internal quotation marks omitted). And "[t]his would include the firing of weapons into occupied vehicles or buildings." *Id.* As we have cautioned, however, these are simply examples of the severity of behaviors necessary to be considered first-degree wanton endangerment. *See id.* at 103. To be convicted, the defendant must have both acted with the requisite mental state and created the danger prohibited by the statute.

Shackles avers that because he fired gun shots into the living room of the Yarbroughs' dwelling, and not directly into the upstairs bedrooms where the three Yarbrough children were hiding, there was insufficient evidence to support the three first-degree wanton endangerment charges. In reaching this conclusion, Shackles relies upon *Swan* and asserts that the Commonwealth could not have established that Shackles created a "substantial danger of death or serious physical injury" to the three children.

In *Swan*, Marcus Swan and D'Andre Owens, armed with handguns, fired shots upward into the ceiling of a home, directly into the fireplace connected to an outside wall, and toward specific victims in the living room located in the front of the home. 384 S.W.3d at 84–86. On appeal, Owens argued that he was entitled to a directed verdict as to the first-degree wanton endangerment charge related to Lumpkins's mother, as she was not located with the other victims in the living room and instead hid in a back bedroom of the home. This Court

28

agreed with Owens, stating that "[n]o evidence showed that a bullet was fired in Ms. Lumpkins' direction[.]" *Id.* at 103. As a result, we held that the trial court in *Swan* erred in failing to grant a directed verdict on the charge of first-degree wanton endangerment as to the hidden victim. *Id* at 104.

Shackles's reliance upon *Swan* is misplaced, and we note that the facts of this case align more closely with those of *Hall.* There, a defendant shot a high-powered rifle multiple times at his next-door neighbors on their front porch while the neighbors' four children "were somewhere inside the house at the time of the shootings." 468 S.W.3d at 817–18. We distinguished *Swan,* noting that "given the nature of the weapon used and the direction in which the shots were fired, *i.e.,* a high-powered rifle fired through a glass storm-door into the interior of the occupied home, the wanton endangerment issue cannot be resolved by our holding in *Swan.*" *Id.* at 829. Instead, this Court held *Paulley v. Commonwealth,* 323 S.W.3d 715 (Ky. 2010) to be more instructive and explained that in *Paulley,* "the Court did not consider the precise location of each of the victims inside [the] home in affirming the denial of the directed verdict." *Id.* at 829. This distinction is relevant when analyzing the criminal liability of a defendant who fires into an occupied home indiscriminately from outside (*Hall,* 468 S.W.3d at 829; *Paulley,* 323 S.W.3d at 724), rather than that of a defendant who targets specific victims after entering the home (*Swan,* 384 S.W.3d at 103). Following this principle, we held that the trial court did not err in denying directed verdicts on the four charges of first-degree wanton

29

endangerment related to the four children inside the home. *Hall*, 468 S.W.3d at 830.

As in *Paulley* and *Hall*, Shackles fired a multitude of shots indiscriminately "into an occupied house." *Id.* During the shooting, the Yarbroughs' baby was in the kitchen, Marvin's brother hid in the living room, and the Yarbroughs' three other children hid in an upstairs bedroom. Bullet holes from the shooting were littered throughout the home. These facts contrast to those in *Swan,* wherein we noted that "Owens and Swan were not firing blindly into an occupied house, such as through a locked door. . . . No evidence showed that a bullet was fired in Ms. Lumpkins's direction or that Owens pointed a gun at her." 384 S.W.3d at 103. Here, the bullet holes located throughout the home indicate that Shackles likely fired in the direction of the three Yarbrough children's hiding place. The danger to the children was substantial. Thus, *Swan* does not mandate the result Shackles seeks.

The only requirement to withstand directed verdict is a "mere scintilla" of evidence. *Taylor,* 617 S.W.3d at 324. In light of the evidence in this case and the reasonable inferences associated with that evidence in the light most favorable to the Commonwealth, there was enough evidence, that is, more than a mere scintilla, to justify presenting the wanton endangerment charges to the jury. *Benham,* 816 S.W.2d at 187. The trial court did not err in denying Shackles's motions for directed verdicts as to the wanton endangerment charges related to the three elder Yarbrough children.

**F. Although the trial court erred in the manner in which it polled the jury, the error did not result in manifest injustice.**

Shackles next alleges that his penalty verdict and persistent felony offender conviction lacked unanimity. During the sentencing phase of Shackles's trial, the trial court read the penalty phase instructions to the jury, which did not appear to contain a unanimous verdict instruction. Defense counsel requested to approach the bench and brought this issue to the trial court's attention. During the bench conference, the following exchange occurred:

> **Defense Counsel**: When we were up here earlier before we did the typos, I'm pretty sure the copy that the court had had the instruction, the presumption of innocence instruction, and . . . also had the right to remain silent and the unanimous verdict . . . version in there. It's not in this version and I don't think it was in the version that the court just read.
> **Trial Court**: How about I just tell them that . . . at all stages . . . and remind them of that?
> **Defense Counsel**: That's fine.

The trial court then addressed the jury and stated:

> Alright, ladies and gentlemen, we were going fast so this is my fault. I omitted something but I want to instruct you. The defendant has a right to remain silent at all stages of the trial, whether it's the guilt phase or the sentencing phase. That's his right, and he exercised that right. And I am instructing you and directing that you can't hold that against him in any way. Do you understand? I need a head nod from everybody.

The trial court then permitted defense counsel to begin closing argument. It did so without objection.

Defense counsel and the Commonwealth then each delivered their closing arguments, and the jury was sent away for deliberation. When the jury

31

returned with its verdict, there was some confusion as to what the jury had marked on the instructions. The trial court conferred with counsel at the bench and all parties agreed about how the verdict should be interpreted. The trial court then directed the following inquiry to the jury foreperson,

> I want to ask you a question, Madam Foreperson, because I want to be sure about what you're requesting. The two assault verdicts were thirty years you've said to serve consecutively, in other words, for a sixty-year sentence. Everything else was a ten-year sentence to be served concurrently. You didn't say it, but I'm assuming concurrently with the sixty-year sentence. So, my question to you, and this is yes or no, I'm interpreting this to be a sixty-year sentence. Was that your intent?

The foreperson responded affirmatively. Nevertheless, in exercising an abundance of caution, the trial court decided to poll the jury, stating, "Okay. Let me poll everyone just in case. Alright, I am going to ask each of you if this is your recommended sentence, was a sixty-year sentence for Mr. Shackles." The trial court began by pointing at the first juror, and asking "So, Chair 1?" The juror responded in the affirmative. The trial court pointed at jurors two through six individually and stated their chair number. Each juror responded affirmatively. For jurors seven through twelve, the trial court simply pointed at each juror when it was their turn to answer. Each of those jurors also affirmed that they had recommended a sixty-year sentence for Shackles.

Pursuant to RCr 9.54(2),

> No party may assign as error the giving or failure to give an instruction unless he has fairly and adequately presented his position by an offered instruction or by motion, or unless he makes objection before the court instructs the jury, stating specifically the

32

matter to which he objects and the ground or grounds of his objection.

The failure to comply with this provision precludes review of any claimed error in the instructions where the aggrieved party failed to preserve the alleged error. *Commonwealth v. Thurman*, 691 S.W.2d 213, 216 (Ky. 1985).

At no point did Shackles object to the trial court's reminder to the jury regarding the missing instructions, nor did he object to the manner in which the jury was polled. Furthermore, Shackles did not request that the trial court specifically ask each juror "was that your verdict?" Accordingly, we hold that this issue is unpreserved. *See Bowman*, 686 S.W.3d at 249 (holding error unpreserved where defendant did not object to manner of jury poll nor request that the judge verbally ask each juror for confirmation of the verdict).

Nevertheless, Shackles's allegation of error implicates his constitutional right to a unanimous verdict. KY. CONST. § 7. "[A]lleged constitutional errors, if unpreserved, are subject to palpable error review." *Walker v. Commonwealth*, 349 S.W.3d 307, 313 (Ky. 2011). We will thus review for palpable error pursuant to RCr 10.26.

It is best practice for the trial court to give an unanimity instruction in writing. *Williams v. Commonwealth*, 464 S.W.2d 806, 808 (Ky. 1971); *Bradley v. Commonwealth*, 439 S.W.2d 61, 64 (Ky. 1969). However, where a trial court fails to do so, a juror poll may serve as a proper corrective course of action to ensure unanimity. *See Powell v. Commonwealth*, 346 S.W.2d 731, 733 n.1 (Ky. 1961) (purpose of polling is to determine that "the jury's verdict reflects the

33

conscience of each of the jurors"). To conduct a successful juror poll, the trial court must "ask[] *each juror* if it is his or her verdict." RCr 9.88 (emphasis added). "While a non-verbal response to the court's queries can be sufficient . . . the response must be to a question specifically posed to that responding juror and to him alone." *Miles v. Commonwealth*, 256 S.W.3d 46, 47 (Ky. App. 2008) (internal citation omitted). Mere gestures by the trial court to each juror are insufficient; the trial court must specifically ask each juror whether it was his or her verdict. *Bowman*, 686 S.W.3d at 250.

This Court addressed circumstances similar to those before us in *Bowman v. Commonwealth*. There, the Appellant requested three separate jury polls at various points throughout the proceeding. *Id.* at 249. For each poll, the trial court began by asking the jury if the previously-read verdict was their verdict. *Id.* Instead of individually asking each juror this question, the trial court simply gestured to each juror and each juror verbally responded "yes." *Id.* While this Court noted that it was error for the trial court to fail to ask each juror individually about the verdict, we held that it did not constitute palpable error. *Id.* at 250. We explained that in order to have found this error palpable,

> [W]e would have to believe that there is a substantial possibility that one or more jurors would have changed their answer from "yes" to "no" if the trial court had asked "was that your verdict" instead of stating that it was going to poll the jury, explaining what that meant, and then gesturing to each individual juror to elicit a response.

*Id.*

Accordingly, we agree with Shackles that the trial court erred in the manner in which it polled the jury. However, as in *Bowman*, we cannot say that

34

this error "resulted in manifest injustice or that there 'is a "substantial possibility" that the result in the case would have been different[.]'" *Id.* (quoting *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006)). We do not believe that any of jurors seven through twelve "would have changed their answer from 'yes' to 'no' if the trial court had asked 'was that your verdict'[.]" We are assured that Shackles's recommended sixty-year sentence was unanimous. In reaching this holding, we also dispose of Shackles's argument that his persistent felony offender conviction lacked unanimity. The jury could not have reached its sixty-year sentence without unanimously agreeing on the persistent felony conviction.

## G. The trial court did not err in permitting Cassandra to testify to Shackles's threats as victim impact evidence during the sentencing phase.

For his final assertion of error, Shackles argues that Cassandra should not have been permitted to testify to the impact of statements made by Shackles in recorded phone calls on her related fear of retaliation. Shackles properly preserved this issue, and we therefore review under the abuse of discretion standard.

The Supreme Court of the United States has held, "[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). Pursuant to Kentucky's truth-in-sentencing statute, KRS 532.055(1),

(a) Evidence may be offered by the Commonwealth relevant to sentencing including:

. . .

7. The impact of the crime upon the victim or victims, as defined in KRS 421.500, including a description of the nature and extent of any physical, psychological, or financial harm suffered by the victim or victims[.]

The purpose of victim impact testimony is "to give the jury an understanding of the impact of the crime being tried, not the defendant's bad character or overall negative effect on society." *St. Clair v. Commonwealth*, 451 S.W.3d 597, 625 (Ky. 2014). "[T]he phrase 'the crime' as used in this statute refers to the tried crime, not any and all crimes the defendant may have committed." *Id.*

Here, following the guilt phase of the trial, the Commonwealth acquired possession of Shackles's jailhouse phone calls, in which he stated to an unknown recipient that, "it took all he had not to turn around after the verdict and tell [Cassandra] she was going to die," and told another unknown recipient that "one of his friends saw her walking down the street and didn't do anything about it. That's not a very good friend." Cassandra was unaware of the phone calls. The trial court permitted her to listen to them.

During her testimony at the sentencing phase, the Commonwealth asked Cassandra how her life had changed after the shooting, and the following exchange occurred:

**Cassandra**: I can't even live in my own home peacefully because I'm afraid that someone is going to come and do something to us.
**Commonwealth**: Have there been specific instances of events that made you scared?
**Cassandra**: Yes.
**Commonwealth**: And what was that?

36

**Cassandra**: I get threats if not daily, then every other day. Most people know where I live at, so that's a struggle. Also, I have to look over my shoulder every time I step outside. It's just hard.

. . .

**Commonwealth**: And did you become aware of a specific fear on Friday?

**Cassandra**: Yes.

**Commonwealth**: What happened there?

**Cassandra**: I had listened to some phone calls, and it's stated that Mr. Shackles had said in one of the phone calls that it took everything to not turn around and tell me that I'm going to die.

**Commonwealth**: As a result of that have you all been staying somewhere else?

**Cassandra**: Yes.

Shackles alleges that the latter part of the testimony, wherein Cassandra references statements made by Shackles in a series of phone calls, amounts to the admission of evidence of Shackles's uncharged bad acts. We disagree. Cassandra's testimony relates directly to the impact of the shooting, *i.e.*, "the tried crime," on her life. The threats that Shackles made in the phone calls were inherently intertwined with the crimes in question. Furthermore, regardless of whether Cassandra was permitted to testify to the threats in the phone calls, we have no doubt that the Commonwealth would have informed her of their existence to ensure that she could take steps to safeguard her own safety and that of her family. It would be nonsensical to permit the first part of Cassandra's testimony related to threats on her life, but thereafter disallow her latter statements simply because the threats came directly from Shackles. This is the very victim impact evidence that KRS 532.055(1)(a)(7) intended to permit. The trial court did not err in allowing Cassandra's testimony on this matter.

37

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

All sitting. Conley, Goodwine and Nickell, JJ., concur. Bisig, J., concurs in result only by separate opinion, in which Lambert, C.J., and Thompson, J., join. Thompson, J., dissents by separate opinion.

BISIG, J., CONCURRING IN RESULT ONLY: I concur in result only. I agree with the majority that Shackles's conviction should be affirmed. I write separately because the Majority Opinion finds that Sergeant Fox's testimony regarding the identification of the cell phone recovered from the scene was hearsay, but that its admission was harmless error. I would find Sergeant Fox's testimony was not hearsay because he took the physical action of dialing a number he obtained from a prior police report which then rang to the phone he collected at the crime scene. The information on Shackles's phone number from the police report was also not hearsay because it was not offered to prove the truth of the number's owner, but to show why he dialed that particular number. Therefore, Sergeant Fox's testimony conveyed the actions he took during his investigative process.

Lambert, C.J., and Thompson, J., join.

THOMPSON, J., DISSENTING: Respectfully, I dissent. Raiantez Shackles has suffered a clear violation of his constitutional right to self-defense under the Second Amendment and Section 1 of the Kentucky Constitution by being denied his right to receive a jury instruction on self-defense regarding assault charges based solely on his status as a convicted felon in possession of a gun.

38

This denial of such an instruction has also violated his due process right to present a defense. I urge Shackles to petition the United States Supreme Court for a writ of certiorari to resolve what rights he retains under the Second Amendment.

I believe that the Second Amendment right to self-defense is a fundamental right. The United States Supreme Court, in recognizing that the Second Amendment contains the individual right to self-defense, has acknowledged its ancient roots: "Citing Jewish, Greek, and Roman law, Blackstone wrote that if a person killed an attacker, 'the slayer is in no kind of fault whatsoever, not even in the minutest degree; and is therefore to be totally acquitted and discharged, with commendation rather than blame.'" *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 768 n.15 (2010) (quoting W. Blackstone, Commentaries on the Laws of England 182 (1769)). The Court has further acknowledged that in *District of Columbia v. Heller*, 554 U.S. 570 (2008) "[the Court] concluded, citizens must be permitted "to use [handguns] for the core lawful purpose of self-defense." *McDonald*, 561 U.S. at 768 (quoting *Heller*, 554 U.S. at 630).

While the right to self-defense can be burdened based on one's status as a felon, it cannot be wholly denied at its core to a substantial portion of our citizens. I contend that all citizens have an absolute right to use justifiable lethal force in the form of a firearm in defense of themselves and this right cannot be abolished based on a statutory legal restriction to possession of firearms.

The Sixth Circuit in *Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002), stated: "We know of no state that either currently or in the past has barred a criminal defendant from putting forward self-defense as a defense when supported by the evidence." Kentucky now boldly takes this untrodden path.

The majority opinion turns the natural right to self-defense on its head by affirming the trial court's denial of Shackles's request for a self-defense instruction based on its erroneous belief that Shackles was not entitled to a self-defense instruction under any circumstances as he acted unlawfully in possessing a firearm as a convicted felon at the time the shooting occurred. The majority opinion reaches such a conclusion without any statutory authority to support its position.

The majority's conclusion can best be explained through its adoption of the Commonwealth's prime assertion at oral argument: "Shackles was unlawful in his possession of a firearm by a convicted felon." Under such reasoning, because Shackles had no right to have a gun in his possession, he was categorically excluded from defending himself with a gun.

"Victim" Marvin Yarbrough told the police in his unequivocal video recorded statement, which was admitted into evidence and played for the jury:

Honestly, **I tried to shoot first**, my gun was on safety.

They started shooting.

I got off safety.

I shot back.

40

(Emphasis added). The majority opinion confirms that "Marvin admits that he drew his weapon first, and that **he would have fired at Shackles first** if the safety had not been on." (Emphasis added). Marvin also recounted to the police that he had a motive for shooting Shackles first without provocation; Marvin stated that after feeling betrayed by Shackles (his close friend who had an affair with Marvin's wife, Cassandra), Marvin put himself "on a path for revenge."

I find such a conclusion to be perplexing and illogical. I conclude that Marvin's admission to police, that he tried to shoot first, when combined with evidence capable of multiple interpretations, required that Shackles's requested self-defense instruction be given and the failure to give that instruction both denied Shackles his constitutional right to present his defense to a jury, and violated his Second Amendment right to engage in self-defense.

The majority opinion concludes that Shackles's status as a convicted felon meant that he could not possess a firearm and, therefore, because any use he made of a firearm was unlawful, this resulted in him forfeiting any right to a self-defense instruction. The majority's action will result in unintended consequences to other classes of persons who are prohibited from possessing firearms.

The entitlement to a self-defense instruction cannot arise or be defeated based on the defendant's legal entitlement to use a firearm, and we should not be engaging in some unexpressed balancing test regarding whether this particular person is worthy of such a defense while this other person is not.

41

This fundamental right, which is expressed in constitutional language, predates the Second Amendment and is so well-established that it has not been questioned by any Court absent the presence of explicit statutory language concerning its unavailability under certain extreme circumstances.[2]

My understanding is not altered by the majority's insertion of a footnote denying that a convicted felon status will always preclude a self-defense instruction. If anything, such footnote implies that sometimes being a felon in possession of a firearm, is sufficient in and of itself to deny a felon this basic constitutional right. By burdening such status, even if only sometimes, the Kentucky Supreme Court creates a new punishment based on having the status of a convicted felon. This significant infringement of Shackles's rights denies him the necessary jury instruction needed for him to pursue his constitutional right to present his self-defense claim to the trier of fact. It comes out of "left field" as no such argument was ever raised in the trial court or even mentioned in the parties' briefs.

While states' prohibitions concerning the possession of firearms vary, federal prohibitions on possessing firearms are broad and apply to various

---

[2] These include where a defendant is engaging in a violent felony at the time the defendant claims to have acted in self-defense against another person. *See Commonwealth v. Fantauzzi*, 73 N.E.3d 323, 332-33 (Mass. App. 2017) (collecting cases regarding split in whether self-defense is available to defend against a charge of felony murder). But if the felony being committed is only being a felon in possession, that cannot forfeit the defense. *Floyd v. State*, 898 S.E.2d 431, 438-39 (Ga. 2024); *Fantauzzi*, 73 N.E.3d at 333. *See State v. McLymore*, 868 S.E.2d 67, 76-77 (N.C. 2022) (limiting disqualification for those engaged in felony to only when state proves "an immediate causal nexus between the defendant's disqualifying conduct and the confrontation during which the defendant used force"); *State v. Williams*, 873 S.E.2d 433, 437-38 (N.C. App. 2022) (applying this standard regarding felon in possession).

groups of people. For example, felons, unlawful users of or those addicted to controlled substances (including marijuana), those adjudicated mentally defective or who has been committed to a mental institution, illegal aliens, and those dishonorably discharged are prohibited from possessing firearms. 18 United States Code (U.S.C.) § 922(g)(1), (3), (4), (5)(A), (6)). Juveniles are prohibited from possessing handguns. 18 U.S.C. § 922(x)(2)(A).

I do not take issue with there being legal ramifications for violating valid laws.[3] What I do take issue with is any ruling that a defendant who illegally possesses a firearm, has thereby forfeited the right to raise self-defense and to receive appropriate instructions, where the defendant has provided sufficient evidence that the victim's actions justified the defendant's reaction.

Possession of a firearm by a convicted felon is a Class D felony. A convicted felon who is armed prior to a conflict with the victim has violated this law. However, committing this crime cannot serve as a basis for turning a justifiable killing into murder with a concomitant potential life sentence. Yet, that is the logical result of the majority opinion which now states that a defendant who is a convicted felon may not be entitled to a jury instruction on the issue of self-defense simply based on the defendant's possession of a firearm. No exceptions are provided, such as if the prior felony conviction was

---

[3] Of course, it is up to the United States Supreme Court to determine whether such laws may run afoul of the Second Amendment. Some people advocate narrowing these prohibitions under the claim that they are overly broad and disparately impact certain groups. *See, e.g.,* Lahny Silva, *The Trap Chronicles, Vol. 3: Felons & Firearms*, 84 Md. L. Rev. 309 (2025).

43

for a low-level, non-violent crime (such as passing a bad check), which occurred decades ago.

I disagree that having the status of being a felon can prohibit a person from being entitled to establish justification for firing a gun in self-defense. Any other conclusion serves to make this status potentially a death sentence at the hands of another who chooses to exercise deadly force against the felon, drug addict, juvenile, or illegal immigrant or, alternatively, subjects people who act in self-defense to murder convictions rather than justified exonerations.[4] The prohibition against possession of firearms by certain groups of people cannot sweep so widely.

Persons who are legally prohibited from possessing firearms for a wide variety of reasons under federal or state law should not thereby also be deprived of their Second Amendment right to self-defense. Should someone who has smoked marijuana be denied a self-defense instruction? Should someone who was many years ago committed to a mental institution for depression be prohibited from defending against a vicious beating? What about the grandmother who pled to a minor felony at age eighteen and has lived a

---

[4] As expressed by Jackson Whetsel, Esq. in *(Un)constitutional Carry: How Drug and Gun Laws Conspire in Statnd Your Ground States to Create a Disarmed, Submissive Class Based on Race*, 53 U. Mem. L. Rev. 571, 632 (2023):

> [T]he ability to defend one's self is the legal essence of what it means to be human and to have the right to live. Taking away one's right to self-defense is to negate the necessary consequence of one's right to life. Viewed in a similar context as the necessary condition to live in our society, the truth of the right to self-defense guarantees the truth of the right to life. Negating the right to self-defense, logically speaking, negates the truth of one's right to life. Essentially, it is impossible to have the right to life without the right to self-defense.

law-abiding life until age eighty and acts in defense of her grandchildren? What about the professor dishonorably discharged many years ago for homosexuality who confronts a mass-shooter at a college? What about a minor who has access to a parent's handgun and is confronted by an armed carjacker?[5]

I conclude that Marvin's admission that he "tried to fire first" supports a reasonable inference that Marvin was acting as "an initial aggressor" or "provoking" Shackles's use of physical force. The majority opinion describes Marvin's statements as a snippet of testimony. Marvin's police interview, which took place without his attorney, was several minutes long. Regardless of its length, Marvin's admission was the only pertinent evidence provided by any party as to how the gunfight was instigated. Cassandra admitted that she was not sure who shot first and was not in a position to observe her husband's actions and the Commonwealth presented no other witnesses to establish this key fact. Therefore, Marvin's admission alone, regardless of its length, provided sufficient evidence that Shackles was entitled to act in self-defense and required that the trial court instruct the jury on this defense regarding the two counts of first-degree assault for shooting Marvin and Cassandra. I would reverse on this issue for a new trial.

---

[5] *See* C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695 (2009) (using her case to illustrate why depriving all felons of guns is inappropriate and arguing that lifetime bans on felons possessing guns in fact is not well established and longstanding in our country and firearm bans are more appropriately applied to felons convicted of crimes of violence for some time).

Regarding the other issues Shackles raises, I join Justice Bisig's concurring in result only opinion as to her conclusion that Sergeant Fox's testimony regarding the cell phone was not hearsay. I otherwise agree with the majority opinion that any other errors that occurred at trial were harmless.

### I. SELF-DEFENSE IS A CONSTITUTIONAL RIGHT.

Self-defense has a long history, stemming back to the ancient world as a natural right conveyed by God in *Exodus* 22:2 which provides an exception to the condemnation of murder in the following circumstance: "If a thief is found breaking in and is struck so that he dies, there shall be no bloodguilt for him[.]"

### A. The Second Amendment Contains a Right to Self-Defense.

In *District of Columbia v. Heller*, 554 U.S. 570, 594 (2008), the United States Supreme Court interpreted the Second Amendment[6] as an individual right which incorporated the natural right to self-protection. The Supreme Court specifically held that a law banning possession of handguns in the home violated the Second Amendment as access to such firearms was needed for self-defense. *Id.* at 635.

In *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010), the United States Supreme Court considered the constitutionality of similar restrictions to those in *Heller* and whether such precedent should apply equally to the states.

---

[6] The Second Amendment to the United Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

In doing so, it extensively considered the issue of self-defense behind the *Heller* holding:

> Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in *Heller,* we held that individual self-defense is "the *central component*" of the Second Amendment right. 554 U.S., at 599; see also *id.*, at 628 (stating that the "inherent right of self-defense has been central to the Second Amendment right"). Explaining that "the need for defense of self, family, and property is most acute" in the home, *ibid.*, we found that this right applies to handguns because they are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," *id.*, at 628 – 629 (some internal quotation marks omitted); see also *id.*, at 628 (noting that handguns are "overwhelmingly chosen by American society for [the] lawful purpose" of self-defense); *id.*, at 629 ("[T]he American people have considered the handgun to be the quintessential self-defense weapon"). Thus, we concluded, citizens must be permitted "to use [handguns] for the core lawful purpose of self-defense." *Id.*, at 630.

*McDonald*, 561 U.S. at 767–68 (footnote and parallel citations omitted). The Court held that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment, thereby making it apply to the states. *Id.* at 791.

In *New York State Rifle & Pistol Association, Inc. v. Bruen,* 597 U.S. 1, 10, (2022), the United States Supreme Court expanded on its holdings in *Heller* and *McDonald* to conclude that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." The United States Supreme Court proceeded to rule:

> [T]he standard for applying the Second Amendment is as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating

that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 597 U.S. at 24 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n. 10 (1961)).

As to the right to carry firearms outside the home, the Court explained:

[C]onfining the right to "bear" arms to the home would make little sense given that self-defense is "the *central component* of the [Second Amendment] right itself." *Heller*, 554 U.S. at 599; see also *McDonald*, 561 U.S. at 767. After all, the Second Amendment guarantees an "individual right to possess and carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, and confrontation can surely take place outside the home.

Although we remarked in *Heller* that the need for armed self-defense is perhaps "most acute" in the home, *id.*, at 628, we did not suggest that the need was insignificant elsewhere. Many Americans hazard greater danger outside the home than in it. See *Moore v. Madigan*, 702 F.3d 933, 937 (CA7 2012) ("[A] Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower"). The text of the Second Amendment reflects that reality.

*Id.* at 32–33 (2022) (parallel citations omitted).

## B. The Kentucky Constitution States an Emphatic Protection of a Citizen's Right to Self-Defense.

Kentucky has similarly recognized that self-defense is a natural right and the Kentucky Constitution, Section 1, is more pronounced on this issue than the federal constitution:

All men are, by nature, free and equal, and have certain inherent and inalienable rights, among which may be reckoned:

First: **The right of** enjoying and **defending their lives** and liberties.
. . . .

48

[and]

Seventh: **The right to bear arms in defense of themselves** and of the State, subject to the power of the General Assembly to enact laws to prevent persons from carrying concealed weapons.

(Emphasis added).

Almost 150 years ago, Kentucky's then highest Court observed: "[T]he great natural right of self-defense . . . must be recognized by the court in all cases in which the evidence is of a character to make it a legitimate subject of consideration by the jury." *Luby v. Commonwealth*, 75 Ky. 1, 7 (1876). In that case the Court noted that the evidence was capable of more than one interpretation and concluded that whether self-defense was necessary under the circumstances "was one for the jury, and not for the court to decide" as the trial court had through an inappropriate instruction. *Id.* at 8.

Similarly, in *Stanley v. Commonwealth*, 86 Ky. 440, 6 S.W. 155, 156 (1887), our highest Court stated:

The right of self-defense rests upon necessity; and apparent reasonable necessity is the whole law and reason of it. It was not derived from society. It is a natural right, instinctive in the person. Man, when he came into society, brought it with him in all its freedom and proudest sense. It has been restricted by law in its exercise to cases of necessity, but cannot be denied.

## C. The Constitutional Right to Self-Defense Protects All Classes of Persons Including Those Who Are Legally Prohibited from Possessing Firearms.

I believe there is an absolute right to exercise self-defense through the use of firearms as expressed in the Second Amendment and the Kentucky Constitution's Section 1. While dangerous felons may be lawfully deprived of their right to bear arms legally (thus incurring a cost should they disobey such

49

a prohibition), their status as felons does not result in a forfeiture of all of their constitutional rights under the Second Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 545-46 (1979) (discussing appropriate limitations on, rather than the wholesale abrogation of, constitutional rights while felons are incarcerated). While felons' constitutional right to keep and bear arms may be somewhat limited—such as from otherwise lawful possession—I posit that they still retain the fundamental right of self-defense which is available to all citizens when they are confronted with deadly force. I believe this is the only way to properly reconcile the *Heller* decision's focus on the Second Amendment being an individual right necessary for self-defense, while also upholding certain regulations under the *Bruen* test.[7]

While possession of a firearm may be criminalized for certain groups of people, I do not believe the defense of self-protection using a firearm can be eliminated. The legislature has proscribed the penalty for being a felon in possession of a firearm, which is a Class D felony, but it has not acted to withdrawal felons' right to self-defense, nor could it do so without running afoul of felons' constitutional right to self-defense.

---

[7] *See* Jackson Whetsel, Esq., *(Un)constitutional Carry: How Drug and Gun Laws Conspire in Stand Your Ground States to Create A Disarmed, Submissive Class Based on Race*, 53 U. Mem. L. Rev. 571, 604, 631-32 (2023); Eric Ruben, *An Unstable Core: Self-Defense and the Second Amendment*, 108 Calif. L. Rev. 63, 75, 90 (2020); Zach Sherwood, *Time to Reload: the Harms of the Federal Felon-in-Possession Ban in A Post-Heller World*, 70 Duke L.J. 1429, 1456-57, 1472 (2021); Conrad Kahn, *Challenging the Federal Prohibition on Gun Possession by Nonviolent Felons*, 55 S. Tex. L. Rev. 113, 128-32 (2013); Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1568 (2009); Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1382 (2009).

## II. THE GENERAL RIGHT TO A SELF-DEFENSE INSTRUCTION

We review the trial court's ruling denying Shackles's self-protection instruction for abuse of discretion. *Ratliff v. Commonwealth*, 194 S.W.3d 258, 274 (Ky. 2006).

### A. Kentucky's Self-Defense Statutes

Kentucky Revised Statutes (KRS) 503.050 (the "self-defense" statute) sets out the standard for when the use of physical force and the use of deadly force are justified for self-protection. KRS 503.050 provides in relevant part:

> (1) The use of physical force by a defendant upon another person is justifiable when the defendant believes that such force is necessary to protect himself against the use or imminent use of unlawful physical force by the other person.
>
> (2) The use of deadly physical force by a defendant upon another person is justifiable under subsection (1) only when the defendant believes that such force is necessary to protect himself against death, serious physical injury, kidnapping, sexual intercourse compelled by force or threat, felony involving the use of force, or under those circumstances permitted pursuant to KRS 503.055.
> . . . .
>
> (4) A person does not have a duty to retreat prior to the use of deadly physical force.

KRS 503.060 (the "self-defense exception" statute) clarifies when KRS 503.050 does *not* justify the use of physical force. KRS 503.060 states:

> Notwithstanding the provisions of KRS 503.050, the use of physical force by a defendant upon another person is not justifiable when:
> . . . .
>
> (2) The defendant, with the intention of causing death or serious physical injury to the other person, provokes the use of physical force by such other person; or

(3) The defendant was the initial aggressor, except that his use of physical force upon the other person under this circumstance is justifiable when:

> (a) His initial physical force was nondeadly and the force returned by the other is such that he believes himself to be in imminent danger of death or serious physical injury[.]

In turn, KRS 503.055 (the "stand your ground" statute) provides additional presumptions favoring a defendant if that defendant is using physical force in defense of a dwelling, residence, or occupied vehicle (defense of "castle") and provides "[a] person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be has no duty to retreat." These presumptions are irrelevant to whether Shackles was entitled to a self-protection instruction as he was not acting in defense of his "castle" and did not seek a "no duty to retreat" instruction.

## B. The Failure to Instruct the Jury on Self-Defense, Where Warranted, Deprives a Defendant of the Due Process Right to Present a Defense.

As explained in *California v. Trombetta*, 467 U.S. 479, 485 (1984): "Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense." Similarly, in *Washington v. Texas*, 388 U.S. 14, 19 (1967), the United States Supreme Court stated "the right to present a defense," which includes "the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies[,] . . . is a fundamental element of due process of law."

The Sixth Circuit in *Taylor,* 288 F.3d at 851–52, connected the right to present a defense as including the right to claim self-defense and receive an appropriate instruction on this defense as follows:

> We hold that the right of a defendant in a criminal trial to assert self-defense is one of those fundamental rights, and that failure to instruct a jury on self-defense when the instruction has been requested and there is sufficient evidence to support such a charge violates a criminal defendant's rights under the due process clause. It is indisputably federal law as announced by the Supreme Court that a defendant in a criminal trial has the right to "a meaningful opportunity to present a complete defense." *California v. Trombetta,* 467 U.S. 479, 485 (1984); *see also Chambers v. Mississippi,* 410 U.S. 284, 294 (1973); *Harrington v. Jackson,* 1 Fed.Appx. 367, [371] (6th Cir. January 10, 2001). A necessary corollary of this holding is the rule that a defendant in a criminal trial has the right, under appropriate circumstances, to have the jury instructed on his or her defense, for the right to present a defense would be meaningless were a trial court completely free to ignore that defense when giving instructions.

> The right to claim self-defense is deeply rooted in our traditions. *See* [*Montana v.*] *Egelhoff,* 518 U.S. [37,] 43 [(1996)] ("Our primary guide in determining whether the principle in question is fundamental is, of course, historical practice"). Blackstone referred to self-defense as "the primary law of nature," and claimed that "it is not, neither can it be in fact, taken away by the law of society." 3 William Blackstone, *Commentaries,* *4. According to him, the common law "held [self-defense] an excuse for breaches of the peace, nay even for homicide itself." *Id.; see also* 4 *id.* at *183–87. It is a well-established rule in federal criminal trials that "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor," including the defense of self-defense. *Mathews v. United States,* 485 U.S. 58, 63–64 (1988); *see also Stevenson v. United States,* 162 U.S. 313 (1896). Even in *Egelhoff,* a case taking a decidedly narrow view of which rights are "fundamental," the Court commented that "the right to have the jury consider self-defense evidence" may be a fundamental right. 518 U.S. at 56 (Scalia, J., plurality opinion). **We know of no state that either currently or in the past has barred a criminal defendant from putting forward self-defense as a defense when supported by the evidence.**

53

(Emphasis added, parallel citations omitted).

Similarly, in *Lannert v. Jones*, 321 F.3d 747, 754 (8th Cir. 2003), the Eighth Circuit stated, "a defendant has a due process right to a self-defense instruction if the evidence satisfies the requirements of the applicable law on self-defense." In *Bradley v. Duncan*, 315 F.3d 1091, 1099 (9th Cir. 2002), the Ninth Circuit explained, "the right to present a defense 'would be empty if it did not entail the further right to an instruction that allowed the jury to consider the defense.'" (Quoting *Tyson v. Trigg*, 50 F.3d 436, 448 (7th Cir. 1995)). *See State v. Prioleau*, 235 Conn. 274, 283–84, 664 A.2d 743, 750 (1995) ("This fundamental constitutional right [to present a defense] includes proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified").

Our Kentucky Courts have always, until now, agreed that "all criminal defendants have a due process right to present a defense, including jury instructions that give effect to a defendant's theory of the case. It is precisely because of this due process right that trial courts have a duty to instruct the jury *on the whole law of the case.*" *Breazeale v. Commonwealth*, 600 S.W.3d 682, 691 (Ky. 2020) (footnotes omitted, emphasis added). *See Brafman v. Commonwealth*, 612 S.W.3d 850, 858 (Ky. 2000) (same). *See also Gray v. Commonwealth*, 480 S.W.3d 253, 266 (Ky. 2016); *Harris v. Commonwealth*, 134 S.W.3d 605, 608 (Ky. 2004) (both reaffirming the defendant's right to present a

54

complete defense). Our precedent relating to the giving of self-defense instructions must be examined from the perspective that failing to give such an instruction, when required, violates a defendant's right to due process and Second Amendment right to engage in self-defense.

"[A] criminal defendant is entitled to jury instructions on any defense supported by the evidence." *Hilbert v. Commonwealth,* 162 S.W.3d 921, 925 (Ky. 2005) (superseded on other grounds by changes to the relevant self-defense statutes). "[T]he entitlement to an affirmative instruction is depend[e]nt upon the introduction of some evidence justifying a reasonable inference of the existence of a defense." *Grimes v. McAnulty*, 957 S.W.2d 223, 226 (Ky. 1997). The "some evidence" requirement "is not a terribly high bar." *King v. Commonwealth*, 513 S.W.3d 919, 924 (Ky. 2017). The trial court is required to provide "instructions applicable to every state of the case deducible or supported to any extent by the testimony." *Taylor v. Commonwealth,* 995 S.W.2d 355, 360 (Ky. 1999). That means that the jury must be allowed to weigh conflicting evidence, make credibility judgments, make reasonable, logical inferences from competent and relevant evidence, and come to an ultimate conclusion on guilt. *Clark v. Commonwealth,* 567 S.W.3d 565, 569–70 (Ky. 2019).

> When there is proof to support a raised defense, it is the jury's prerogative, not the court's or Commonwealth's, to consider all of the evidence and decide whether to accept or reject it. "[N]o matter how preposterous, any defense which is supported by the evidence must be submitted to the jury. 'It is the privilege of the jury to believe the unbelievable if the jury so wishes.' " *Taylor,* 995 S.W.2d

55

at 361 (quoting *Mishler v. Commonwealth*, 556 S.W.2d 676, 680 (Ky. 1977)).

*King*, 513 S.W.3d at 925. *See Taylor v. Commonwealth*, 671 S.W.3d 36, 44-45 (Ky. 2023) (reiterating the jury's right to believe the unbelievable). If the evidence is conflicting as to whether the defendant was acting in self-defense, *this becomes a jury question. Chaffins v. Commonwealth*, 275 S.W.2d 52, 54 (Ky. 1955). "The jury is the sole judge of credibility and may pick and choose what evidence to accept or reject." *Taylor*, 671 S.W.3d at 44.

## C. Failing to Testify Does Not Deprive a Defendant of the Right to Receive an Instruction on Self-Defense.

The only argument raised to the trial court by the Commonwealth as to why Shackles was not entitled to a self-defense instruction was that he did not testify. This was not a sufficient ground to deny Shackles such an instruction.

"Kentucky courts have long held that a defendant need not testify in order to receive an instruction on self-defense." *Hilbert*, 162 S.W.3d at 924. It does not matter that the defendant's entitlement to act in self-protection is based on the defendant's subjective belief that it is needed; wholly circumstantial evidence can justify such instruction. *Id.* A self-defense instruction must still be given even if "the evidence supporting [the defendant's] belief in the need for the use of force was not strong, nor free from contradiction." *Id.* at 925. "[S]uch evidence need only raise the issue, for an instruction on self-defense is necessary once sufficient evidence has been introduced at trial which could justify a reasonable doubt concerning the defendant's guilt." *Id.*

56

**D. Being a Felon in Possession of a Firearm Does Not Deprive a Defendant from Receiving a Self-Defense Instruction.**

In Kentucky, the legislature has not enacted any limitation on qualifying for the defense of self-protection where the defendant, as a convicted felon, was not legally permitted to carry a firearm. KRS 503.050(2) provides justification for the use of deadly physical force "when the defendant believes that such force is necessary to protect himself against death [or] serious physical injury[,]" without any qualification. While there certainly can be criminal consequences from being a felon in possession of a firearm, this does not include a deprivation of one's right to defend oneself or another from deadly force.

Other state jurisdictions when confronted with similar situations, agree that the fact that the defendant was a felon in possession does not deprive that defendant of the right to receive a self-defense instruction where otherwise warranted by the evidence. It does not matter if the defendant arrived with the firearm, the justification arises from the situation the defendant is confronted with at the time the defendant engages in the use of force.

For example, in *People v. Allen*, ___ N.W.3d ___, 2025 WL 1349396, at *4 (Mich. App. May 8, 2025), the prosecution argued that the defendant was not entitled to a self-defense instruction because the defendant was a felon in possession of a firearm and possessed that firearm for most of the day leading up to the shooting. The defense argued the defendant's status as a felon in possession should not matter as the defendant was not seeking a "stand your ground" instruction pursuant to statute, but a common law self-defense

57

instruction. The trial court refused to instruct the jury on self-defense based on the defendant's extended possession of the illegal firearm and the defendant's willingness to go outside with the victim. The Court explained that the defendant's illegal possession of the firearm did not disqualify the defendant from receiving the common law instruction on self-defense, which included the duty to retreat. *Id.* at *5.

As to the trial court's justification that the instruction was not warranted based on the defendant's willingness to fight the victim, in *Allen* the Court noted that the defendant had testified that the victim threated him, and he thought he saw the victim reach for a gun from his pocket. Accordingly, "it was not the function of the trial court to determine whether the defendant was being truthful" and the trial court "usurped the role of the jury by determining that [the] defendant was not credible and that he did not have an honest and reasonable belief that his life was in imminent danger." *Id.* The Court added: "We are aware of no doctrine from which we could conclude that because [the] defendant at one point had no fear of imminent death, that he cannot hold that belief later when circumstances change" and "it was for the jury to decide whether his version of event was more believable." *Id.*

Similarly, in *Diggs v. State*, 168 So.3d 156, 161 (Ala. Crim. App. 2014), the state argued that where the defendant, who was a felon, hosted a paid event at an abandoned house while unlawfully armed, he was not justified in using physical force to defend himself because he was both the initial aggressor and engaging in unlawful activity, thus negating his right to engage in self-

defense. The Court rejected such an argument, explaining that if the jury believed the defendant's version of the events that the "victim" was the initial aggressor when during their discussion he suddenly and without provocation pulled out his pistol and shot at the defendant, the jury could find the defendant acted in self-defense. *Id.* at 162.

The Court explained that the defendant simply "starting a controversy" through "discussions" regarding the victim's treatment of a third party was not the same thing as being an initial aggressor with force and declared that "a felon is not deprived of the right to use a firearm against the immediate need to defend his life." *Id.* The Court explained that while "[the defendant's] possession of a firearm before the need to defendant his life may have been an event in violation of the law . . . , his possession of a firearm was justified at the moment it became necessary for his self-defense." *Id.* Accordingly, the Court concluded that the inferences to be drawn from the evidence presented were for the jury, and not the trial court, and by refusing to give the requested self-defense instruction the trial court "eviscerated" the defendant's "entire defense" which denied him a fair trial and required reversal. *Id.*

In another similar case, *State v. Smith*, 993 N.W.2d 576, 590 (S.D. 2023), the Court observed:

> The fact that Smith was prohibited from possessing a firearm because of his status as a felon, but chose to arm himself before leaving the apartment, was at best tangential to the question of whether Smith acted reasonably for the purpose of self-defense. Under the instructions, the proper focal point of the reasonableness analysis for self-defense was not whether, as a convicted felon, Smith illegally armed himself before any need to

59

defend himself arose. It was whether—at the moment Smith brandished and proceeded to fire the gun—he had a reasonable belief concerning the danger he faced and acted reasonably and proportionately in response.

Our Court has never previously used our "stand your ground" law to prohibit giving a self-defense instruction to a felon in possessions of a firearm. In *Curry v. Commonwealth*, 620 S.W.3d 563, 569-70 (Ky. 2020), our Court ruled that the trial court did not abuse its discretion when it declined to give the jury a "stand your ground" instruction due to the defendant's engagement in an unlawful activity. The defendant in *Curry* had requested and received a self-defense instruction.

The *Curry* Court summarized that in *Ragland v. Commonwealth*, 476 S.W.3d 236, 244 (Ky. 2015), the Court opined that "the fact that a criminal defendant is entitled to a jury instruction on self-defense does not automatically entitle him to **an additional instruction on no duty to retreat**." *Curry*, 620 S.W.3d at 568 (emphasis added). *Ragland* reversed for a new trial where the self-defense instruction erroneously incorporated aspects of the KRS 503.055 "stand your ground" statute, determining that this conflation was inappropriate and prejudicial where an option for retreating did not apply to the circumstances, such instruction was not requested by the defendant, and its inclusion needlessly complicated the jury's findings. *Ragland*, 479 S.W.3d at 243-45.

Our sister jurisdictions which have similar "stand your ground" laws, have held that while felons in possession of a weapon are ineligible for "stand

your ground" instructions because they are violating the law by having a firearm, the felon is not excluded from eligibility for a general self-defense instruction. Such felons have a duty to retreat in accordance with the common law requirements for self-defense.

For example, in *Wallace v. State*, 216 So. 3d 464, 474 (Ala. Crim. App. 2015), the Court in reliance on *Diggs* noted that while a felon who unlawfully possessed a firearm when he left his apartment was entitled to a self-defense instruction, he was not entitled to a "stand your ground" instruction because he was engaged in an unlawful activity and instead had a duty to retreat.

In *State v. Perrier*, 536 S.W.3d 388, 399-401 (Tenn. 2017), the Court examined its similar "stand your ground" law which contained "unlawful activity language" but concluded "that based on where this language was located, "that the phrase 'engaged in unlawful activity' applies only to a person's duty to retreat" and concluded such interpretation was consistent with other states who used similar language in regard to the castle doctrine.

### III. CONCLUSION

The right to self-defense is embedded in the Second Amendment to the United States Constitution and in Section 1 of the Kentucky Constitution. While states may properly burden that right with laws which make it illegal for certain persons to bear arms and require legal consequences for the violation of such laws, it cannot strip anyone of the fundamental right to self-defense which justifies the use of deadly force in appropriate circumstances. If there is some evidence which would support a self-protection instruction, a trial court

abuses its discretion by refusing to give such an instruction to the jury so that it can resolve the factual disputes for itself. The majority compounds such error by justifying its decision based on Shackles's status as a convicted felon.

The majority creates a new punishment: Lifetime forfeiture of any right to self-defense with a firearm by virtue of having the status of being a convicted felon. This is a vast expansion of the punishment for the crime of being a felon in possession, and this punishment is created by our Court without any input from the legislature, the lower court, or the parties. Instead, our Court's decision summarily upends centuries of common law and legal precedent.

If we allow such an alteration to this natural right to self-defense when appropriately justified by the threat, we will be outliers in the civilized world. Going forward, in every plea colloquy, such a penalty would require a warning before giving up this fundamental right.

I do not understand this outcome-driven majority opinion. I do not see what substantive harm can come from letting the jury decide whether Shackles's actions warrant convictions for first-degree assault or were instead justified. Fairness requires that the appropriate process be followed without regard for expediency when a person's right to freedom or incarceration hangs in the balance. I have faith that a new jury could be properly entrusted to reach the appropriate outcome from the evidence presented. I express no opinion as to what that outcome may be. Accordingly, I would reverse and remand for a new trial.

COUNSEL FOR APPELLANT:

Christopher Barrett Thurman
Assistant Public Defender

COUNSEL FOR APPELLEE:

Russell M. Coleman
Kentucky Attorney General

John Hail Heyburn
Assistant Attorney General

Bryan Darwin Morrow
Assistant Attorney General

Jenny Lynn Sanders
Assistant Attorney General